DLA PIPER RUDNICK GRAY CARY US LLP
David J. Romanski (SBN #073963)
Gregory K. Jung (SBN #203350)
333 Market Street, Suite 3200
San Francisco, CA 94105-2150
Telephone:    (415) 659-70000
and
E. RANDOLPH TUCKER (BBO #503845)
JOHN A. D. GILMORE (BBO #193060)
BRUCE E. FALBY (BBO #544143)
KIRSTEN M. NELSON (BBO #634520)
One International Place
Boston, MA 02110-2600
Telephone:    (617) 406-6000
Attorneys for Plaintiff
I-ENTERPRISE COMPANY LLC

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO**

| | |
|---|---|
| I-ENTERPRISE COMPANY LLC,<br>            Plaintiff<br><br>            v.<br><br>DRAPER FISHER JURVETSON MANAGEMENT COMPANY V, LLC; DRAPER FISHER JURVETSON MANAGEMENT CO. VI, LLC; TIMOTHY C. DRAPER, individually and as general partner in DRAPER FISHER JURVETSON; JOHN H.N. FISHER, individually and as general partner in DRAPER FISHER JURVETSON; and STEPHEN T. JURVETSON, individually and as general partner in DRAPER FISHER JURVETSON,<br>            Defendants | Case No. C 03-1561 MMC<br><br>**THIRD AMENDED COMPLAINT OF I-ENTERPRISE COMPANY LLC**<br><br>**JURY TRIAL DEMANDED**<br><br>Electronic Case Filing, L.R. 5-4 |

**THIRD AMENDED COMPLAINT OF I-ENTERPRISE COMPANY LLC**

**Introduction**

1.      In 1998 and 1999, plaintiff I-Enterprise Company LLC ("I-Enterprise") through its predecessors-in-interest committed to invest $41,645,000 in two venture capital funds that were promoted and managed by defendants.  I-Enterprise and its predecessors-in-interest to date have

1.
THIRD AMENDED COMPLAINT OF I-ENTERPRISE; DEMAND FOR JURY TRIAL
Case No. C 03 1561 MMC

invested $37,382,651 in those two funds (approximately 89% of the capital committed).  In this action, I-Enterprise seeks to recover for fraudulent and negligent misrepresentations, breach of contract, breach of fiduciary and other duties, state securities law violations, state unfair business practices, conversion and unjust enrichment in connection with these investments.  Plaintiff also seeks an accounting.

2.     In the marketing and management of the two funds, defendants made material misrepresentations/omissions and engaged in breaches of contractual, fiduciary and other duties including the following:

- Misrepresenting that the funds would "invest in many companies" and focus on investing small amounts "in very low-priced stock in start-up companies" in the "seed or start-up round" of financing after conducting extensive due diligence and then work closely with those companies to prepare them for "mainstream" venture capital investment in later rounds of financing.

- Instead, investing large amounts in high-priced stock in later rounds of financing of a small number of companies in a compressed time frame without conducting adequate due diligence and without working closely with the companies at their seed stage to prepare them for later rounds of financing  – in complete disregard to their representations and investment objectives and in violation of contractual and fiduciary obligations.

- Misrepresenting that they had made capital contributions in the past and their intention to make capital contributions in the future and failing to make required capital contributions to the funds for more than 50 successive capital calls – an aggregate default of more than $4.7 million.

- Manipulating and/or failing to satisfy the preconditions for receiving disproportionate "carried interest" distributions of securities from the funds and thereby taking for themselves securities that should have been distributed to I-Enterprise and its predecessors-in-interest.

- Failing to devote adequate time to appropriately manage the affairs of the funds (although they were receiving $14 million in annual management fees) and instead promoting and managing other large venture funds so that they could collect additional management fees (as much as $25 million or more annually) from those other funds.

- Misrepresenting their success with prior funds and with prior particular investments.

- Making materially false and misleading statements about the management fees they would charge the funds and omitting to disclose material information necessary to make statements made about the management fees not misleading.

3.      As a result of the above, I-Enterprise and its predecessors-in-interest have suffered damages and have claims in excess of $40 million in connection with the funds while defendants have paid themselves over $80 million in management fees and collected approximately $30 million in other distributions from those same funds.

**Parties**

4.      Plaintiff I-Enterprise Company LLC ("I-Enterprise") is a Delaware limited liability company with a place of business in Hingham, Massachusetts.  I-Enterprise has a single member, which is a Delaware limited liability company the members of which are all Massachusetts citizens. I-Enterprise acquired its interest in Draper Fisher Jurvetson Fund V, L.P. and Draper Fisher Jurvetson Fund VI, L.P. from its predecessors-in-interest (who were partners since the formation of the funds)  pursuant to the terms of the limited partnership agreements.

5.      Defendant Draper Fisher Jurvetson Management Company V, LLC ("Fund V General Partner") is a California limited liability company with a place of business in Redwood City, California. The members of the Fund V General Partner are twelve individuals all of whom are citizens of California and one limited liability company whose sole member is a citizen of Michigan. The Fund V General Partner is the general partner of Draper Fisher Jurvetson Fund V, L.P. ("Fund V"), a California limited partnership.

6.      Defendant Draper Fisher Jurvetson Management Co. VI, LLC ("Fund VI General Partner") is a California limited liability company with a place of business in Redwood City,

California. The members of the Fund V General Partner are fifteen individuals who are citizens of California, one individual who is a citizen of Virginia and one limited liability company whose sole member is a citizen of Michigan.   The Fund VI General Partner is the general partner of Draper Fisher Jurvetson Fund VI, L.P. ("Fund VI"), a California limited partnership.

7.     Defendant Timothy C. Draper ("Draper") is an individual residing, on information and belief, in California.  Draper is a Managing Member and Managing Director of the Fund V and Fund VI General Partners.  Draper is also a general partner in the general partnership Draper Fisher Jurvetson.

8.     John H.N. Fisher ("Fisher") is an individual residing, on information and belief, in California.  Fisher is a Managing Member and Managing Director of the Fund V and Fund VI General Partners.  Fisher is also a general partner in the general partnership Draper Fisher Jurvetson.

9.     Stephen T. Jurvetson ("Jurvetson") is an individual residing, on information and belief, in California.  Jurvetson is a Managing Member and Managing Director of the Fund V and Fund VI General Partners.  Jurvetson is also a general partner in the general partnership Draper Fisher Jurvetson.

## Jurisdiction

10.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332.

## FACTUAL ALLEGATIONS

### Draper Fisher Jurvetson Background and History

11.     Draper Fisher Jurvetson ("DFJ") is a partnership under California law.  DFJ does business at an address in Redwood City, California.  The partners of DFJ are defendants Draper, Fisher and Jurvetson who are jointly and severally liable in tort and contract for conduct within the

scope of the partnership.  DFJ and defendants Draper, Fisher and Jurvetson are referred to collectively herein as the "Individual Defendants."

12.     The Individual Defendants create, promote and sell limited partnerships that, under the direction and control of general partner entities that are created, dominated and controlled by the Individual Defendants, purportedly engage in early stage venture capital investments.  Defendants Draper, Fisher and Jurvetson, act as managers of the general partners of the limited partnerships.

13.     As alleged below with particularity, the Individual Defendants knowingly induced investors to invest in the limited partnerships they promoted and organized, and in which they would have a substantial financial interest, by personally preparing and disseminating offering literature over their individual names, which literature contained promises concerning their personal involvement in the management of the limited partnerships, their personal experience and expertise and the investment strategies they had personally developed and would follow when they were personally managing the limited partnerships.

14.     According to the Individual Defendants in the written offering memoranda for Funds V and VI (the "Offering Memoranda"), "[s]ince 1985 Draper Fisher Jurvetson has focused on investing in the seed, or start-up round, primarily in information technology companies."

15.     As set forth by the Individual Defendants in the Offering Memoranda, between 1985 through June 1998, DFJ formed four venture capital funds.  The first four funds invested approximately $100 million in approximately 100 early stage technology companies over a 13-year period.

16.     According to the Individual Defendants, "early stage investors are able to buy the very low priced stock in start-up companies that can produce extraordinary returns."  The Individual Defendants claimed to be "the first professional investor in over 80% of our portfolio companies."

The Individual Defendants claimed that they worked extensively with the management of the portfolio companies to grow the companies for future rounds of venture capital investment from "mainstream" venture capital funds.  The Individual Defendants claimed that by investing before mainstream funds, they could "raise follow-on money for our portfolio companies on quite favorable terms" and get "pricing leverage on both sides of our initial investment."   The Individual Defendants claimed that these four early funds achieved high returns for investors.  These claims were all made in the Offering Memoranda which were prepared and disseminated by the Individual Defendants.

17.     On the basis of their first four funds, the Individual Defendants cultivated a reputation as leaders and specialists in seed/early stage venture capital investment in information technology companies.  The Individual Defendants touted their success as a seed/early stage venture capital firm and held themselves out as one of the few firms that focused on early stage/seed investments. The Individual Defendants claimed that their success was the result of investing small initial amounts in "true 'seed' deals," as opposed to "mainstream" venture funds that invest large amounts after the seed stage of investment. These claims were all made in the Offering Memoranda for Funds V and VI, which were prepared and disseminated by the Individual Defendants.

**Fund V and Fund VI Organization and Management**

18.     Building off the successes of their first four venture capital funds, the Individual Defendants decided to raise a fifth fund in 1998.  Fund V closed on July 31, 1998.  Shortly after the closing of Fund V, the Individual Defendants began marketing a sixth fund, Fund VI.  Fund VI closed on August 13, 1999.

19.     Fund V and VI (collectively the "Funds") were both marketed through the Offering Memoranda.

20.     Both Funds were formed as California limited partnerships by the Individual Defendants pursuant to the terms of the California Revised Limited Partnership Act.

21.     Each of the Funds has a general partner that is an entity created, controlled and dominated by the Individual Defendants.  The Fund V General Partner is Draper Fisher Jurvetson Management Company V, LLC and the Fund VI General Partner is Draper Fisher Jurvetson Management Co. VI, LLC (the Fund V General Partner and the Fund VI General Partner are referred to collectively herein as the "Fund General Partners").  Each of the Funds also has a number of limited partners.

22.     In order to become a limited partner, I-Enterprise, through its predecessor-in-interest, was required to execute a Subscription Agreement and a Limited Partnership Agreement in connection with each Fund.  The Subscription Agreement is an offer that, when accepted, obligated I-Enterprise's predecessor-in-interest to commit capital to the Fund.  I-Enterprise's predecessor-in-interest, Stephen Roy, signed the Fund V Subscription Agreement the same day he executed the Fund V Limited Partnership Agreement and sent both documents to the Individual Defendants at the same time.  The Fund VI Subscription Agreement, which was signed by Intercontinental Ventures LLC, I-Enterprise's predecessor-in-interest, expressly incorporates all of the terms of the Fund VI Offering Memorandum.  In addition, both the Fund V and Fund VI Limited Partnership Agreements state that the primary purpose of the partnership is "to make venture capital investments in early stage companies."  The Limited Partnership Agreements further state that, in making investment decisions, "INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING," which are set forth in the Offering Memoranda.  Accordingly, the Limited Partnership Agreements incorporate the terms of the Offering Memoranda.

The Fund V and VI Subscription Agreements and Limited Partnership Agreements are referred to collectively hereinafter as the "Agreement(s)."

23.     The Individual Defendants are the managing members of the Fund General Partners and have the sole and exclusive right to manage and control the Fund General Partners. The Individual Defendants prepared or directed the preparation of the Agreements.  At the time the Agreements were prepared and sent to I-Enterprise's predecessors-in-interest, neither the Funds nor the Fund General Partners existed.  The Individual Defendants delivered these documents to I-Enterprise's predecessor-in-interest and solicited and accepted I-Enterprise's predecessors-in-interest investment in the Funds.

24.     Under the Agreement for each Fund, the Fund General Partner, dominated and controlled by the Individual Defendants, has an affirmative obligation, and the sole and exclusive right, to manage and control the Funds.

25.     Pursuant to the terms of the Agreements, the Individual Defendants agreed to devote appropriate time to manage effectively the affairs of the partnership.  Under the Agreements, the Fund General Partner is required to notify the limited partners if defendants Draper and Fisher (and defendant Jurvetson as well for Fund VI) are no longer active in the management of the Fund General Partner.  Upon such notice, the limited partners may by vote of two-thirds in interest terminate the partnership.

26.     Under the Agreements, the Fund General Partner is required to notify the limited partners if the General Partner or any of its Managing Members has committed a Detrimental Act. The Agreements define Detrimental Act as willful misconduct which directly causes a material adverse effect to the Partnership or its assets.  Upon notice of a Detrimental Act, the limited partners may by vote of two-thirds in interest terminate the Partnership.

27.     Pursuant to the Agreements, the Fund General Partners and the Individual Defendants agreed not to "sell, assign, pledge, mortgage, or otherwise dispose of or transfer its share in the Partnership or in its capital assets or property" except under limited circumstances.

28.     Under the terms of the Agreements, the term of the Funds is ten (10) years, subject to earlier termination in the event, among other things, of the Fund General Partners' bankruptcy.

## Capital Calls/Investments

29.     Pursuant to the Agreements, each limited partner committed a certain amount of capital to invest in the Fund (the "Committed Capital").  The amount of Committed Capital of each limited partner determined the limited partner's percentage ownership interest in the partnership.

30.     The limited partners committed approximately $181 million to Fund V and $375 million to Fund VI.

31.     The Committed Capital is not paid to the Fund immediately but rather is drawn down over time in proportional increments from each limited partner as required by the General Partner.

32.     In addition, the Fund General Partners are required to make contributions of one and one ninety-ninth percent (1 - 1/99%) of the amount committed by the limited partners.  Pursuant to the Agreements, the Fund General Partners are required to make their contribution "in cash or by full recourse demand promissory note."  In addition, the General Partner of Fund VI is required to "engage in a 'continuous make-up' of the limited partners' capital account."

33.     The failure of any of the partners to make a required capital contribution is a violation of the Agreement and a default.  In addition, the failure of the Fund General Partners to contribute capital is a material breach of the Agreement.

34.     As the Committed Capital is drawn down and capital is contributed by the partners, it is invested by the Fund General Partner.  Pursuant to the terms of the Agreements, the Committed

Capital is to be invested in accordance with the investment strategy specified in the Offering Memoranda.

35.     Stephen B. Roy made a commitment of $10,000,000 in capital to Fund V and became a limited partner at the time of the creation of Fund V in July 1998.  Mr. Roy assigned $200,000 of that interest to a third party in early 1999 and assigned his remaining $9,800,000 interest in Fund V to Intercontinental Ventures LLC in an unqualified assignment in early 1999 pursuant to the terms of the Fund V Partnership Agreement and with the consent of the Fund V General Partner.  Mr. Roy, as trustee of the Stephen Roy revocable trust, is a member of Intercontinental Ventures LLC. Intercontinental Ventures LLC thereafter assigned its $9,800,000 interest in Fund V to I-Enterprise in an unqualified assignment pursuant to the terms of the Fund V Partnership Agreement and with the consent of the Fund V General Partner.  Intercontinental Ventures LLC is the sole member of I-Enterprise, its wholly owned subsidiary. I-Enterprise, by virtue of the assignment to it, has succeeded to all claims, rights, titles and interests of its predecessors-in-interest with respect to Fund V, including but not limited to the claims asserted in this case.  I-Enterprise, and its predecessors-in-interest, to date have contributed $9,677,500 to Fund V, approximately 99% of its Committed Capital, and have met all of the capital calls. The capital committed and contributed by I-Enterprise and its predecessors-in-interest to Fund V has conferred a benefit on the Fund V General Partner in that it has enabled the Fund V General Partner to collect the fees and distributions described below.

36.     Intercontinental Ventures LLC made a commitment of $31,845,000 in capital to Fund VI and became a limited partner at the time of the creation of Fund VI in August 1999. Intercontinental Ventures LLC assigned its full interest in Fund VI to I-Enterprise in an unqualified assignment pursuant to the terms of the Fund VI Partnership Agreement and with the consent of the Fund VI General Partner.  Intercontinental Ventures LLC is the sole member of I-Enterprise.  I-

Enterprise, by virtue of the assignment to it, has succeeded to all claims, rights, titles and interests of its predecessor-in-interest with respect to Fund VI, including but not limited to the claims asserted in this case.   I-Enterprise, and its predecessor-in-interest, to date have contributed $27,705,151 to Fund VI, approximately 87% of its Committed Capital, and have met all of the capital calls.  The capital committed and contributed by I-Enterprise and its predecessor-in-interest to Fund VI has conferred a benefit on the Fund VI General Partner in that it has enabled the Fund VI General Partner to collect the fees and distribution described below.

**Compensation of General Partner/Returns to Limited Partners**

37.     The Agreements provide that the Fund General Partners are entitled to a management fee.  The annual management fee for both Fund V and Fund VI is 2.5% of the Committed Capital. The Agreements state that from the management fee, the General Partners shall bear all normal operating expenses incurred in connection with the management of the Partnership, including salaries, wages, travel, entertainment and other expenses.  Neither the Offering Memoranda nor the Agreements adequately disclose that the General Partners collect the management fee on capital that the General Partners have not contributed, on capital that has not been invested but has been reserved to pay management fees, on capital that the General Partner has invested and lost, or on capital that has been invested and subsequently distributed to the limited partners.  Nor do the Offering Memoranda or Agreements disclose the material facts that the General Partners will receive additional fees from affiliate DFJ funds for deal flow belonging to the funds, that the management fees bear no relation to the operating expense of the funds, that having achieved liquidity events for the funds the General Partners will cause the funds to hold liquid shares and distributable cash to pay management fees, or that even if an Individual Defendant ceases all activity on behalf of the fund he will still receive millions of dollars of management fees.

38.     To date, the Fund General Partners have paid themselves over $80 million in management fees on Funds V and VI.  Over the remaining life of the Funds, the Fund General Partners will collect approximately over another $50 million in management fees.  Based on the Individual Defendants' own fund asset valuation at September 30, 2004, the Fund V management fee is presently nearly 20% per year as a percentage of assets under management and will consume nearly 60% of the remaining assets of Fund V over its remaining scheduled term.  Based on the Individual Defendants' own fund asset valuation at September 30, 2004, the Fund VI management fee is presently nearly 9% per year as a percentage of assets under management and will consume nearly 38% of the remaining assets of Fund VI over its remaining scheduled term.

39.     The Fund General Partners are also entitled to a disproportionate share of the partnership profits under certain circumstances.  The Agreements provide for the allocation of partnership profit and loss.  Subject to certain preconditions, in Fund V, 20% of the profit is allocated to the General Partner (even though it is only obligated to contribute one and one ninety-ninth percent (1 - 1/99%) of the capital contributed by the limited partners) and 80% is allocated to all partners in proportion to their relative capital contributions.  In Fund VI, the corresponding split is 25% for the General Partner and 75% for all partners.

40.     Distribution of Marketable Securities, limited to securities that are traded on a national securities exchange or subject to an effective Securities Act registration statement, and distribution of cash from portfolio company liquidity events is at the Fund General Partners' discretion, subject to its fiduciary obligations to act in good faith and in the best interests of the limited partners and other duties.  In exercising their discretion in good faith and subject to their fiduciary obligations, the Fund General Partners must distribute marketable securities in a manner that provides the limited partners, including I-Enterprise, with maximum value.  The Fund General

Partners may not hold onto Marketable Securities for their own self interest at the expense of I-Enterprise.

41.     Pursuant to the Agreements, if, among other things, a) the net asset value of the partnership after the distribution will exceed the sum of the capital accounts of all partners, and b) there are no unrestored "reallocated losses," then Marketable Securities may be distributed 20% in Fund V (25% in Fund VI) to the Fund General Partner and 80% in Fund V (75% in Fund VI) to all partners in proportion to their relative capital contributions.

42.     If there is an unrestored reallocated loss prior to a distribution of Marketable Securities, the Fund General Partner must make all distributions of Marketable Securities to the partners in proportion to their respective partnership interests until it is restored.

43.     The Agreements do not authorize disproportionate distributions of securities that are not Marketable Securities under any circumstances.

44.     To date, the Fund V General Partner has collected over $30 million in distributions of securities from Fund V in addition to approximately $30 million in management fees.  I-Enterprise, however, has received distributions nominally valued by the Fund V General Partner as barely equal to its Committed Capital, and no profits.  Accordingly, although Fund V was supposed to be an 80/20 split of profits between the limited partners and the General Partner, the General Partner has received all of the profits.  The management fees and distributions have conferred a benefit on the Fund V General Partner.

45.     To date, the Fund VI General Partner has collected approximately $50 million in management fees.  There has been a single distribution from Fund VI, the total nominal value of which was only approximately $2.4 million.  Meanwhile, Fund VI has reported net realized and unrealized investment losses of approximately $204 million on about $311 million of contributed capital.  I-Enterprise has lost approximately $18 million out of the approximately $28 million it has contributed to date.  The management fees and distribution have conferred a benefit on the Fund VI General Partner.

### **Marketing of Fund V and VI**

46.     Fund V and Fund VI were marketed to I-Enterprise's predecessors-in-interest in Massachusetts through both written Offering Memoranda and oral representations.  The Offering Memoranda contained material misstatements to induce investment in Funds V and VI.

Fund V

47.     At the time of the marketing of Fund V, neither Fund V nor the Fund V General Partner existed.  Fund V was promoted and marketed by the Individual Defendants.  When it was created, the Fund V General Partner adopted the representations and commitments in the Offering Memorandum.

48.     Stephen B. Roy, predecessor-in-interest to I-Enterprise, met with defendant Fisher at the offices of the Individual Defendants in Redwood City, California in or about May or June 1998 to discuss Mr. Roy's potential investment in Fund V.  During that meeting, defendant Fisher indicated that DFJ occupied a unique niche among venture capital firms and that DFJ was unlike mainstream venture capital firms because it invested at a very low price at a very early stage in information technology companies and worked closely with portfolio companies to develop their business.  Defendant Fisher stated that because they invested at such an early stage, they received tremendous value when larger, mainstream firms invested in the companies at a later stage.  At the end of the meeting, defendant Fisher told Mr. Roy that he would send him the offering documents for Fund V.  Defendant Fisher was acting within the scope of the DFJ partnership.

49.     The Individual Defendants provided a copy of the Fund V Offering Memorandum to Mr. Roy under cover of letter dated June 26, 1998 sent to Mr. Roy's business address in Hingham, Massachusetts. The letter was on "Draper Fisher Jurvetson" letterhead and contained the following signature block:

> Sincerely,
>
> DRAPER FISHER JURVETSON
>
> Timothy C. Draper
> John Fisher
> Steve Jurvetson

50.     The text of the letter used the terms "we" and "us" repeatedly to refer to the Individual Defendants as the parties responsible for the creation, promotion, sale and management of the Funds.  Both letters stated that "[I]f you have any questions about the Partnership, please call us . . ." (emphasis added).

51.     All references in the Fund V Offering Memorandum are to the Individual Defendants as the creators, promoters, sellers and managers of the Fund.  The Individual Defendants are the creators, promoters, sellers and managers of Fund V and the representations in the Fund V Offering Memorandum were made by the Individual Defendants.

52.     The Individual Defendants prepared or directed the preparation of the Fund V Offering Memorandum, made the statements therein or approved and adopted the statements as their own.  The Individual Defendants made the statements in the Fund V Offering Memorandum because, among other things, a) they sent the Fund V Offering Memorandum to I-Enterprise's predecessors-in-interest under their individual names and signature block, b) the Fund V Offering Memorandum was issued in the name of the Individual Defendants and described them as the creators, promoters, sellers and managers of Fund V, and c) neither Fund V nor the Fund V General Partner existed at the time and therefore neither could have made the statements.

Fund VI

53.     At the time of the marketing of Fund VI, neither Fund VI nor the Fund VI General Partner existed.  Fund VI was promoted and marketed by the Individual Defendants.  When it was created, the Fund VI General Partner adopted the representations and commitments in the Offering Memorandum.

54.     In or about May 1999, Mr. Roy met with defendant Fisher in Boston, Massachusetts. In or about June 1999, Mr. Roy spent the day at the offices of the Individual Defendants in Redwood

City, California and met with the Individual Defendants.  On both occasions, Mr. Roy discussed a potential investment in Fund VI.  Defendant Fisher again emphasized to Mr. Roy that DFJ continued to occupy its unique niche by investing in very early stage information technology companies.  At the meeting in or about June 1999, the Individual Defendants stated that they would provide the offering documents for Fund VI.  The Individual Defendants were operating within the scope of the DFJ partnership.

55.     After these meetings, in or about July 1999, the Individual Defendants provided a copy of the Fund VI Offering Memorandum to Intercontinental Ventures LLC, predecessor-in-interest to I-Enterprise, at its offices in Hingham, Massachusetts.

56.     All references in the Fund VI Offering Memorandum are to the Individual Defendants as the creators, promoters, sellers and managers of the Fund.  The Individual Defendants are the creators, promoters, sellers and managers of Fund VI and the representations in the Fund VI Offering Memorandum were made by the Individual Defendants.

57.     The Individual Defendants prepared or directed the preparation of the Fund VI Offering Memorandum, made the statements therein or approved and adopted the statements as their own.  The Individual Defendants made the statements in the Fund VI Offering Memorandum because, among other things, a) they sent the Fund VI Offering Memorandum to I-Enterprise's predecessors-in-interest after meeting with Mr. Roy and discussing a potential investment in Fund VI, b) the Fund VI Offering Memorandum was issued in the name of the Individual Defendants and described them as the creators, promoters, sellers and managers of Fund VI, and c) neither Fund VI nor the Fund VI General Partner existed at the time and therefore neither could have made the statements in the Offering Memorandum.

<u>The Representations in the Offering Memoranda</u>

58.    The Fund V and VI Offering Memoranda contained false and misleading statements to induce I-Enterprise's predecessors-in-interest to invest in the Funds.

59.    The Offering Memoranda repeatedly represented that Funds V and VI would follow the Individual Defendants' "proven investment strategy" and invest in accordance with the investment objectives and practices followed by the first four successful funds as described in paragraphs 14 through 17, and that the General Partners of the Funds would conduct extensive due diligence and work closely with portfolio companies to prepare them for follow on rounds of financing from mainstream venture funds.

60.    The front page of both the Fund V Offering Memorandum, dated June 1998, and the Fund VI Offering Memorandum, dated July 1999, stated:

Draper Fisher Jurvetson
An Early Stage Venture Capital Firm
Presents
Fund V[I]

61.    The Fund V Offering Memorandum touted the Individual Defendants as operating "one of the most prominent firms in the early stage venture capital industry."

62.    The Fund V and Fund VI Offering Memoranda recited the Individual Defendants' investment history and returns in the first four funds to date and stated that those results "confirm the Managing Directors' strong beliefs in the rewards of early stage venture capital investing."  The Offering Memoranda made detailed representations about the success of the first four funds, and the Fund VI Offering Memorandum added the same with respect to Fund V, including representations about return multiples, internal rates of return (IRR), so-called "if held" values, and other information relating to the performance of the funds.

63.     The Offering Memoranda stated that Funds V and VI would follow a "back-to-basics" investment approach and make small "seed" investments "in unproven, teams, markets and technologies," buy "very low-priced stock in start-up companies" and work with and prepare those companies to be handed over to "mainstream venture capital firms."

64.     The Offering Memoranda recited the competition the Individual Defendants face from other firms and described the various types of venture capital investing as a) large, later stage funds, b) seed funds and c) venture angels.

65.     According to the Offering Memoranda:

> The influx of capital into the venture industry has caused the major venture firms to shift their investment focus toward larger and later-stage investments. This change in emphasis has created a void in the industry with few established firms and few experienced venture capitalists focusing on early stage investment opportunities.  It is precisely this gap which Draper Fisher Jurvetson fills.  Draper Fisher Jurvetson offers an essential service to both the entrepreneur, by providing critical seed capital and start-up expertise, and to the large established venture funds, by providing a flow of attractive companies in which they can invest at later stages.

66.     The Offering Memoranda distinguished large, later stage funds from seed funds such as those managed by the Individual Defendants and stated that large, later-stage funds are "under pressure to invest the significant amounts of capital they manage" and that, while they occasionally make seed investments, they have a "structural inability to make the small kinds of investments most start-ups require," and their "seed and very early stage investments . . . account for only a small percentage of their invested capital."  The Offering Memoranda stated that these large, later stage funds become the Individual Defendant's collaborators after the Individual Defendants have made a seed investment in a portfolio company "as we often invite them in to the larger, later rounds of investment in our own portfolio companies."  The Offering Memoranda stated that occasionally the large funds will "transform a traditional seed investment into a large start-up financing" by revising

a business plan "to call for more employees and more capital, effectively by passing the seed stage." The Offering Memoranda stated that while there may be some projects that require this accelerated growth, the Individual Defendants believe and have found that most start-up companies need to build their team, products and culture over time.

67.     The Offering Memoranda further stated that there are only a "handful of early stage venture funds" but that the Individual Defendants rarely face head-to-head competition from these "other seed groups."   The Offering Memoranda stated that the Individual Defendants "consistently invest[] at an earlier stage than most other firms" and that the influx of capital into the venture industry had caused most "major venture firms to shift their focus toward larger and later-stage investments."  According to the Offering Memoranda, early stage funds have the best results of all venture capital funds.

68.     The Offering Memoranda described "venture angels" as friends and family providing financing start-up companies.  The Offering Memoranda stated that, in most cases, it is the "early stage venture capitalist" who restructures the company after making an investment and therefore venture angels represent only minor competition for the Individual Defendants.

69.     The Fund V Offering Memorandum stated that "[t]he firm's 'franchise' has become synonymous with seed stage and start-up investing."  The Fund VI Offering Memorandum similarly stated that the Individual Defendants  are "firmly established as one of the most prominent firms in the early stage venture capital industry.  By continuing our proven people, market, and business model-focused approach to early stage venture capital investing, and by creating new companies in which to invest, [Fund VI] will pursue extraordinary capital gains for its Limited Partners."

70.     The Fund V and VI Offering Memoranda both stated that the Individual Defendants would, in Funds V and VI, continue their "proven investment strategy," which they claimed

consisted "primarily" of a) an early stage focus, b) a focus on information technology companies, c) investing at an "earlier" stage to obtain higher returns, d) "spreading risk by investing in many companies," e) investing small initial amounts, f) "working hard for our portfolio companies to position them for larger, follow-on rounds of 'mainstream' venture capital financing" (as to Fund V) or "larger follow on rounds of financing" (as to Fund VI) and g) cutting off "losers" early.

71.     The Fund V and VI Offering Memoranda touted "relatively small, early stage deals" as an "underserved niche" in the venture capital arena that the Individual Defendants served.  The Offering Memoranda stated that after investing in the early stage and building up the company, the Individual Defendants were able to get favorable terms for follow-on investments from "mainstream" venture firms that have to compete with one another under "pressure to invest the significant amounts of capital they manage."

72.     Further touting their experience and expertise in early stage investing, the Individual Defendants claimed that early stage investing was desirable because of the possibility of "the 'super-deal' – a seed stage investment at a very low valuation in a company that later becomes exceedingly valuable."  The Fund V and VI Offering Memoranda both stated "[w]e are avidly committed to early stage investing, knowing that while such 'super deals' are rare, *they are only available to early stage investors*." (emphasis in original).

73.     Because of the risk associated with investing in early stage rounds, the Fund V and VI Investment Memoranda stated that the Individual Defendants would spread the risk "widely over many different companies."  The Offering Memoranda stated that this diversification meant that the DFJ Managing Directors assumed many board seats but that they "generally [did] not stay on individual corporate boards for too long."  The Offering Memoranda stated that "the Managing

Directors of the existing Draper Fisher Jurvetson funds intend to resign from those boards where our expertise as early-stage investors is no longer required."

74.     The Offering Memoranda further detailed an eight step due diligence process that the Fund General Partners would follow in selecting portfolio companies, including reading the business plan and assessing the management team, evaluating the market, examining the business model, checking references, calling potential customers, evaluating the product or technology, and evaluating the risks and rewards.  According to the Offering Memoranda, only 5% of the prospects survive the reading of the business plan and approximately one-quarter (Fund V) or two-tenths (Fund VI) of 1% get funding.

75.     The Fund V Offering Memorandum stated that the Fund would follow the Individual Defendants' "proven investment strategy," which involved initial investments between $500,000 and $2.5 million followed by participation in subsequent financing "up to a maximum of $7.5 million in any one company."

76.     The Fund VI Offering Memorandum stated that the Fund would invest between $1 million and $5 million in seed/start-up rounds followed by participation in subsequent rounds of financing.

77.     These representations in the Offering Memoranda describing the venture capital market, DFJ's position in the market, and the nature of the investments that the Funds could and would make were false and misleading and failed to disclose information necessary to make the representations not misleading under the circumstances.  By 1998 and even more so in 1999, when the Individual Defendants were marketing Fund VI, the venture capital market and DFJ's position in the market had dramatically changed.

78.     For example, contrary to the representations of the Individual Defendants that they filled an industry "void," that early stage investing was an "underserved" niche, that there were only a handful of early stage venture funds, that they rarely encountered other such funds in head-to-head competition, that they had strong pricing leverage when they made initial investments, and that the larger size of Fund VI was necessary in order to maintain large early ownership positions through follow-on rounds, in fact, the venture capital market had experienced explosive growth with a dramatic increase in the number of venture capital firms at all stages, there were historically high levels of capital available in the market, DFJ faced intense competition from other funds, and in order to participate in deals they were having to write much bigger checks and make much larger initial investments than in the past.

79.     Contrary to the representations of the Individual Defendants that their positioning enabled them to get favorable terms for follow-on investments from "mainstream" venture firms that have to compete with one another under "pressure to invest the significant amount of capital they manage," in fact, DFJ was itself transitioning to become a "mainstream" firm, and the Individual Defendants were under significant pressure to invest the ever-increasing amounts of capital they were raising.

80.     Contrary to the representations of the Individual Defendants that they would invest small amounts in many start-up and "true 'seed' deals," in fact, the large size of Funds V and VI and the small number of experienced investment professionals who would invest them created a structural inability to make and closely manage the small investments start-ups and true seed deals require.

81.     The Individual Defendants had an incentive to misrepresent the market, their position in it, and the nature of the investments in the Funds in order to induce investment by I-Enterprise's

predecessors-in-interest, because they stood to realize enormous personal financial reward through their contemplated equity ownership of the Fund General Partners, which charge management fees based on a percentage of the committed capital irrespective of the performance of the Funds.  The capital committed by I-Enterprise and its predecessors-in-interest has yielded over $1 million in annual management fees for the Fund General Partners out of a total of $14 million in annual management fees received by the Fund General Partners.

### Contractual and Fiduciary Obligations

82.     The Fund V and Fund VI General Partners owe contractual duties to I-Enterprise as set forth in the Agreements, including, but not limited to, duties with respect to properly managing the Funds, identifying investment opportunities, contributing capital to the Funds, investing of money by the Funds,  allocating profits and losses, distributing Marketable Securities by the Funds and acting in good faith in the best interests of I-Enterprise as a limited partner.

83.     The Individual Defendants owe a contractual duty to I-Enterprise to dedicate appropriate time to effectively manage the affairs of Fund V and Fund VI, which in the case of Fund VI was at least 50% of their time.  The Individual Defendants also owe a contractual duty to I-Enterprise not to take action in contravention of the Agreements and not to transfer their partnership interests.

84.     The Fund V and VI General Partners owe fiduciary duties to I-Enterprise, including a duty to act in accordance with the terms and investment objectives and practices set forth in the Offering Memoranda and Agreements and to conduct the affairs of the partnerships in the best interest of I-Enterprise, as a limited partner, and not in their own self interest.

85.     The Individual Defendants owe fiduciary duties to I-Enterprise as described below.

86.     The Individual Defendants were promoters, insiders and sellers of limited partnership interests in the Funds as alleged above.  The Individual Defendants created the Funds, marketed the Funds, prepared the Offering Memoranda, sent the Offering Memoranda to I-Enterprise's predecessors-in-interest and met personally with Stephen Roy concerning the investments by I-Enterprise's predecessors-in-interest in the Funds.  All of this occurred prior to the creation of the respective Fund General Partners.  The Individual Defendants therefore owed a fiduciary duty to I-Enterprise including a duty to act in good faith and to render a full and fair disclosure of all facts and to act in accordance with the investment objectives and practices in the Offering Memoranda and to conduct the affairs of the partnerships in the best interest of I-Enterprise, rather than in their own self-interest.

87.     The Individual Defendants have a substantial ownership interest in and control the Fund General Partners. The Individual Defendants assumed certain responsibilities with respect to the Funds, including personal management responsibilities.  The Individual Defendants marketed the Funds by touting their personal expertise and experience.  The Individual Defendants made a contractual commitment in the Agreements to personally dedicate appropriate time to effectively manage the affairs of the partnerships, which in the case of Fund VI was at least 50% of their time. The Individual Defendants agreed not to take action in contravention of the Partnership Agreements. The Agreements required that I-Enterprise be notified and entitled to seek a termination of the Fund if the Individual Defendants were no longer active in the management of the affairs of the Funds or had committed a Detrimental Act. Through this conduct, the Individual Defendants personally had a relationship of trust and confidence with I-Enterprise giving rise to a personal fiduciary obligation in connection therewith.

88.     The Fund V and VI General Partners and the Individual Defendants similarly owe I-Enterprise an obligation of good faith and fair dealing in connection with the affairs of the partnerships both under California Corporate Code §16404(d) and common law.

## MISCONDUCT

89.     The Fund V and VI General Partners and the Individual Defendants engaged in a pattern of misconduct in connection with their solicitation of investments in and management of Funds V and VI including, but not limited to, the following:

### Failure to Fund Capital Calls

90.     The Fund V and VI Agreements require the Fund General Partner to fund capital calls "in cash or by full recourse demand promissory note."

91.     In violation of the Agreements and their fiduciary duties, the Fund V General Partner (beginning in 1998) and the Fund VI General Partner (beginning in 1999), without the knowledge of I-Enterprise, defaulted on every capital call made (more than 25 in each Fund), a total default of more than $4.7 million to date.

92.     Unbeknownst to I-Enterprise, the Fund General Partners did not contribute capital to the Funds as they were required to do under the Agreements.  To disguise their failure to contribute capital, the Fund V and VI General Partners provided worthless long-term, nonrecourse notes for some of their capital calls that state that the Fund General Partners are not liable on the notes.  These notes were nominally "secured" only by the pledge of Fund General Partners' interests in the partnerships. Because the Fund General Partners failed to contribute capital, their interests in the partnerships never had any value. The Fund General Partners' steadily increasing capital accounts deficits are, in fact, a substantial liability, not an asset.  The Funds' outside accountants, Pricewaterhouse Coopers LLP, recognized that the notes provided were worthless and did not

amount to any contribution of capital to the partnerships, and therefore the amount of the worthless notes was backed out of the Fund General Partners' capital accounts, resulting in a net zero contribution.

93.     The Fund General Partners' breach has reduced the net assets of the partnerships, and, in the case of Fund V, certain losses sustained by the partnership could only be and were charged against positive capital account balances of the limited partners, including I-Enterprise. Accordingly, I-Enterprise has been damaged because I-Enterprise's capital accounts and the value of its partnership interests are both lower than they would have been had the Fund General Partners fulfilled their obligation to contribute capital.

94.     Furthermore, the failure of the Fund General Partners to make their required capital contributions was a material breach of contract.  Because of this material breach of contract, I-Enterprise was relieved of its obligation to contribute capital.  The Fund General Partners nevertheless required I-Enterprise to contribute almost $35 million of capital without informing I-Enterprise that the Fund General Partners were in material breach of the Agreements.  By contributing capital when it was not obligated to do so, I-Enterprise has been damaged at least to the extent capital contributions were made and lost.  Moreover, because the Fund General Partners were in material breach of their obligations, they were not entitled to receive the other benefits of the Agreements that they received, further damaging I-Enterprise.

95.     In breach of their obligations, the Fund V and VI General Partners provided only long-term, nonrecourse notes for some of their capital calls.  In addition, when the Funds were in need of cash, the notes were never called for payment.  Instead, the Fund General Partners required I-Enterprise to contribute more capital, which would not have been necessary had the General Partners honored their obligations to contribute capital.

96.     With respect to Fund VI, the Fund VI General Partner and the Individual Defendants represented in the Fund VI Partnership Agreement that the Fund VI General Partner would be making capital calls by cash or through full recourse demand promissory notes.

97.     The Fund VI Partnership Agreement was sent to Intercontinental Ventures LLC, predecessor-in-interest to I-Enterprise in Hingham, Massachusetts under cover of letter dated August 3, 1999 from the Individual Defendants.  The letter was signed:

> Sincerely,
>
> Draper Fisher Jurvetson
>
> Timothy C. Draper
> John Fisher
> Steve Jurvetson

98.     The Individual Defendants prepared or directed the preparation of the Fund VI Partnership Agreement.  At the time that the Individual Defendants sent the proposed Partnership Agreement to I-Enterprise's predecessor-in-interest, neither Fund VI nor the Fund VI General Partner existed.  The draft Partnership Agreement (and the statements made therein) was sent to Intercontinental Ventures LLC by the Individual Defendants to induce investment in Fund VI.

99.     When I-Enterprise's predecessor-in-interest, Intercontinental Ventures LLC, purchased its limited partnership interest in Fund VI in August 1999, it relied on the representation concerning capital calls in the Fund VI Partnership Agreement and on the fact that the Fund VI General Partner would be investing along with I-Enterprise and that the Fund VI General Partner would have a personal stake in the management of the monies to be invested by Fund VI.  This was a material inducement to Intercontinental Ventures LLC's investment decision.

100.     At the time of the marketing and creation of Fund VI in July and August 1999, the Fund V General Partner was already in default of the requirements that it make capital calls in cash

or full recourse demand promissory notes.  Therefore, the Fund VI General Partner knew or was reckless in not knowing that the statement in the Fund VI Partnership Agreement that the Fund VI General Partner would make capital calls in cash or full recourse demand promissory notes to Fund VI was false because at the time that statement was made, the Fund V General Partner (which had the same managing members, the Individual Defendants) had already repeatedly violated that obligation in Fund V.

101.    The Individual Defendants knew or were reckless in not knowing that the statement in the Fund VI Partnership Agreement that the Fund VI General Partner would make capital calls in cash or full recourse demand promissory notes to Fund VI was false because, at the time the statement was made, the Fund V General Partner (of which the Individual Defendants were the managing members and which they controlled) had already repeatedly violated that obligation in Fund V.

102.    The Fund VI General Partner and Individual Defendants failed to disclose facts that under the circumstances in which the above representation was made would have made it not misleading – that the Fund V General Partner was in default of its obligations and had made no capital contribution in any form.

### Violation of Investment Objectives and Practices

103.    Contrary to the representations made in the marketing of Funds V and VI and in derogation of their duties under the Agreements, the Fund V and VI General Partners and the Individual Defendants failed to follow the stated investment objectives and practices of the Funds.

104.    The Fund V and VI General Partners and the Individual Defendants invested large amounts of capital in later rounds of financing of a small number of companies rather than being the

first professional investor and investing small amounts in the first rounds of financing in many early stage/seed companies.

105.     Although defendants represented that they would follow the same investment objectives and practices of their earlier funds, compared to the first four funds created and managed by the Individual Defendants, which invested approximately $100 million in approximately 100 companies over 13 years, Fund V invested approximately $71 million in a portfolio of companies assembled in only fourteen months and limited to only 21 companies in which it subsequently invested another $82 million, and Fund VI invested approximately $123 million in a portfolio assembled in only ten months and limited to only 24 companies in which it subsequently invested more than another $100 million.

106.     Contrary to their representations and duties, the Fund V and VI General Partners and the Individual Defendants failed to conduct adequate due diligence on portfolio companies prior to investing.  Instead of properly investigating portfolio companies, the Fund V and VI General Partners rushed to invest the amounts committed to the Funds. Given the rapidity of the investments, the Fund V and VI General Partners and the Individual Defendants did not engage in the eight-step due diligence process that they represented and committed to follow.

107.     As discussed in paragraphs 137 through 145 below, the Fund V and VI General Partners and the Individual Defendants were, among other things, busy raising additional large funds in order to increase the amount of management fees they were collecting and therefore failed to act in the best interest of the limited partners by acting with haste and imprudence in investing the Committed Capital in Funds V and VI.

108.    The Fund V and VI General Partners and the Individual Defendants did not spend time working closely with the portfolio companies and their management teams to get them ready for later mainstream venture capital rounds of financing as they represented they would.

109.    The Fund V and VI General Partners and the Individual Defendants also repeatedly made investments in excess of the stated initial and maximum total per company limits.

110.    In particular, in Fund V, where the General Partner and the Individual Defendants stated that they would not invest more than $7.5 million in any single company, the Fund V General Partner and the Individual Defendants made at least nine investments (out of a total of only 21) in excess of this limit, resulting in more than $20 million in losses (at least $1 million to I-Enterprise) that would not have been incurred had the investment limits been followed.

111.    The Fund V and VI General Partners and the Individual Defendants also over concentrated the investment risk by investing quickly and in large amounts in a few companies, rather than spreading the risk over many companies as they claimed and promised they would.

112.    The Fund V and VI General Partners and the Individual Defendants failed to recognize losses and "cut off losers early" as they claimed they would in the Offering Memoranda. Instead, the Fund General Partners and the Individual Defendants held onto investments as they lost value and continued to invest additional amounts in portfolio companies that were failing.  In several instances, these additional investments were made to defer recognition of losses that would have reduced subsequent distributions to the Fund V General Partner.

113.    In addition, contrary to the representations that the Individual Defendants would not stay on boards of portfolio companies for long periods of time, the Individual Defendants assumed board seats in portfolio companies and remained on them for long periods of time to the detriment of the Funds.

114.     In addition, under the terms of the Agreements, the Fund General Partners, the Individual Defendants and their affiliates are prohibited from selling securities to the Funds without the consent of all of the limited partners. Notwithstanding this contractual prohibition, the Fund VI General Partner without the requisite consent used Fund VI assets to purchase shares of DFJ affiliate Amazing Media for $10.9 million, which are now valued at $2.2 million, resulting in a loss of $700,000 for I-Enterprise.  The Fund V General Partner without the requisite consent used $3.6 million of Fund V assets to invest in DFJ affiliate Vizional, an investment now valued at $1.2 million, resulting in a loss of over $100,000 for I-Enterprise.

115.     Contrary to its contractual and fiduciary obligations, the Fund VI General Partner has failed to engage in a continuous make-up of the limited partners' capital.  I-Enterprise's limited partner capital account has been depleted by approximately $18 million since the inception of Fund VI and no amount has been made up by the Fund VI General Partner.

116.     The large, non-performance based management fees on the Funds provided an incentive for the defendants to misrepresent the nature of the investment in the Funds and then invest quickly, contrary to the represented investment objectives and practices, so that defendants could continue to raise larger funds and generate even more fees.

117.     As a result of the General Partners' and the Individual Defendants' failure to follow the stated and committed investment objectives and practices, I-Enterprise has suffered significant damages, including approximately $18 million in investment losses in Fund VI alone.

### Allocation of Profit and Loss and the Distributions of Securities and Cash

118.     Contrary to the provisions of the Fund V Agreement, which only entitles the Fund V General Partner to 20% of distributions of certain securities under limited circumstances when certain preconditions are met, the Fund V General Partner engaged in a pattern of conduct to

wrongfully take 20% of several distributions of securities that should have been distributed wholly or partially 100% pro rata amongst the partners.

119.     In particular, the Fund V General Partner took a 20% share on a March 2001 distribution of Cyras stock even though the requirements of the Agreement for the 20% distribution were not satisfied, thereby wrongfully increasing its share of the distribution by $17 million or more, and wrongfully under distributing to I-Enterprise by approximately $830,000.

120.     In addition, in an effort to increase the amount of distributions collected by the Fund V General Partner, beginning in 1998, the Fund V General Partner improperly calculated and allocated profit and loss so as to understate deficiencies in the Fund V General Partner's capital account and to hide the existence of "reallocated losses" and to then artificially and improperly meet the prerequisites for receiving 20% of distributions of securities. The Fund V General Partner made these improper allocations and calculations on multiple occasions, resulting in excess distributions of shares to the General Partner.

121.     The Fund V General Partner engaged in these improper calculations and allocations with respect to the accounting for investment gain and loss.  The Fund V Partnership Agreement requires that "Profit and Loss" be calculated for capital account allocations in the same manner as the calculation of Fund V's taxable income.  The Fund V Partnership Agreement also requires that the Fund's books and records be kept in accordance with GAAP.

122.     Contrary to these requirements in the Fund V Partnership Agreement and in violation of GAAP, with respect to calendar year 1998, the Fund V General Partner recorded approximately $2.3 million of "Gain on Investments" attributable to unrealized appreciation on securities that did not represent income or gain for purposes of either federal income taxes or under GAAP.  This resulted in the Fund V portfolio claiming net income of $508,377 rather than a loss of approximately

$1.8 million for 1998.  In addition, the Fund V General Partner wrongfully allocated 91% of this overstated net income to the Fund V General Partner, thereby concealing a deficit in the Fund V General Partner's capital account due to non-funding contributions.

123.    The improper and artificial calculation and allocation of profit and loss in Fund V began as early as 1998, prior to I-Enterprise's predecessor-in-interest's investment in Fund VI.  The Fund VI General Partner and the Individual Defendants represented in the marketing of Fund VI in the Fund VI Offering Memorandum and in the Fund VI Agreement that the Fund VI General Partner would calculate and allocate profit and loss in a specified manner (the same as that represented in the Fund V Agreement) and would take a disproportionate 25% of distributions from Fund VI only under certain circumstances.  As alleged above in paragraphs 53 through 57, the Fund VI Offering Memorandum and Agreement were provided to I-Enterprise's predecessor-in-interest, Intercontinental Ventures LLC, by defendants to induce investment in Fund VI.

124.    The representations concerning the calculations and allocations were materially misleading because they failed to disclose that the Fund V General Partner was already improperly calculating and allocating profit and loss under parallel provisions of the Fund V Agreement so as to wrongfully improve the apparent financial results of Fund V, understate deficiencies in the Fund V General Partner's capital accounts and thereby position itself to take from Fund V 20% of distributions that should have been paid 100% to all of the partners.

125.    The Fund VI General Partner knew or was reckless in not knowing that these representations were false and misleading because at the time the representations were made, the Fund V General Partner (which had the same managing members as Fund VI, the Individual Defendants) had already begun this pattern of improper accounting under the parallel provisions of the Fund V Agreement.

126.    The Individual Defendants knew or were reckless in not knowing that these representations were false and misleading because, at the time the representations were made, the Fund V General Partner (of which the Individual Defendants were the managing members and which they controlled) had already begun this pattern of improper accounting under the parallel provisions of the Fund V Agreement.

127.    The Fund VI General Partner and the Individual Defendants failed to disclose facts necessary to make the above representations not misleading under the circumstances, namely that the Fund V General Partner and the Individual Defendants were manipulating the profits and losses of Fund V to wrongfully improve the apparent financial results of Fund V, understate deficiencies in the Fund V General Partner's capital accounts and thereby improperly take portions of distributions to which they were not entitled.  I-Enterprise relied on this misrepresentation and/or omission in investing in Fund VI.

128.    In addition, the Fund V General Partner abused its discretion and failed to act in good faith by failing to distribute Marketable Securities in a timely manner in the best interests of I-Enterprise and instead holding onto those securities out of self interest.  Several companies in the Fund V portfolio became public or were acquired by public companies and Fund V was thereafter holding publicly traded shares.  Rather than distribute these shares in a timely manner to the limited partners, including I-Enterprise, the Fund V General Partner held onto the shares, in some cases for a period of several years, while the value of these shares plummeted dramatically in value.  In one instance, the Fund V General Partner failed to distribute shares of a publicly traded portfolio company while its value fell over a six month period from $180 million to $25 million.  Had the Fund V General Partner distributed these shares in good faith and in a timely manner to I-Enterprise, I-Enterprise would have been able to sell these shares at a substantially higher value and would have

THIRD AMENDED COMPLAINT OF I-ENTERPRISE; DEMAND FOR JURY TRIAL
Case No. C 03 1561 MMC

obtained liquidity in this position long ago.  The Fund V General Partner failed to exercise its discretion in good faith and breached its fiduciary obligations in violation of the Fund V Agreement by failing to distribute these shares in a timely manner for reasons of self interest, including, but not limited to, an effort to make the internal rate of return of the Fund appear higher.  In addition, holding onto the publicly traded shares was contrary to the investment objectives and practices contained in the Offering Memorandum and Agreement, in that the Fund V General Partner and the Individual Defendants stated, among other things, that their expertise was in early stage companies where they could add value, not in publicly traded, post-venture companies.  Accordingly, there was no good faith basis for the Fund V General Partner to hold publicly traded shares that should have been distributed to I-Enterprise.  The shares that the Fund V General Partner failed to distribute in a timely manner include Wit Capital, Net Zero and Ciena.

129.    The Fund V General Partner also abused its discretion and failed to act in good faith by failing to distribute cash proceeds of liquidity events involving Fund V portfolio companies Eclipse, etang, Brightlink and Wit Capital/Soundview promptly after receipt.

130.    The Fund VI General Partner abused its discretion and failed to act in good faith by failing to distribute Marketable Securities in a timely manner in the best interests of I-Enterprise and instead holding onto those securities out of self interest.  Several companies in the Fund VI portfolio became public or were acquired by public companies and Fund VI was thereafter holding publicly traded shares.  Rather than distribute these shares in a timely manner to the limited partners, including I-Enterprise, the Fund VI General Partner held onto the shares, in some cases for a period of years.  Had the Fund VI General Partner distributed these shares in good faith and in a timely manner to I-Enterprise, I-Enterprise would have been able to sell these shares and obtained an event of liquidity in these positions long ago.  The Fund VI General Partner failed to exercise its discretion

THIRD AMENDED COMPLAINT OF I-ENTERPRISE; DEMAND FOR JURY TRIAL
Case No. C 03 1561 MMC

in good faith and breached its fiduciary obligations in violation of the Fund VI Agreement by failing to distribute these shares in a timely manner for reasons of self interest, including, but not limited to, an effort to make the internal rate of return of the Fund appear higher.  In addition, holding onto the publicly traded shares was contrary to the investment objectives and practices contained in the Offering Memorandum and Agreement in that the Fund VI General Partner and the Individual Defendants stated, among other things, that their expertise was in early stage companies where they could add value, not in publicly traded, post-venture companies.  Accordingly, there was no good faith basis for the Fund VI General Partner to hold publicly traded shares that should have been distributed to I-Enterprise.  The shares that the Fund VI General Partner failed to distribute in a timely manner include distributions of United Online, Extended Systems and Keynote Systems.

131.    The Fund V General Partner failed to recognize losses on and/or to write down investment values in order to artificially and improperly meet the prerequisites for receiving 20% of the distribution of securities.

132.    In particular, the Fund V General Partner failed to recognize losses on and/or to write down investment values of  Eclipse, Third Voice, Brightlink, eTang, Saltare, LiveAdvice, Everdream, Global Sight, Brodia, Digital Work, Tacit, ePocrates, Best Offer, Work Exchange, and RealNames among others.  By doing so, the Fund V General Partner artificially satisfied the prerequisites of receiving 20% of distributions of Marketable Securities.

133.    The Fund VI General Partner also abused its discretion and failed to act in good faith by failing to distribute cash proceeds of liquidity events involving Fund VI portfolio companies Achex and Closed Loop promptly after receipt.

134.    The Fund V General Partner has also made investments for the purpose of avoiding immediate loss recognition and book value write downs and artificially and improperly meeting the preconditions for a disproportionate distribution of Marketable Securities.

135.    Finally, the Fund V General Partner has manipulated and overstated the net asset value of Fund V, again to enable it improperly to take 20% of distributions of Marketable Securities by artificially and improperly satisfying the prerequisites of the Agreement.

136.    Through the above conduct, the Fund V General Partner has taken securities for itself that should have been distributed to I-Enterprise and I-Enterprise has been damaged.

**Failure to Devote Appropriate Time and Attention to the Funds**

137.    The Fund V and VI Partnership Agreements provide, under the heading "Commitment," that each Individual Defendant agrees to "devote so much of his time to the conduct of the affairs of the Partnership and the General Partner as is appropriate in his judgment to manage effectively the affairs of the Partnership."

138.    In exchange for and in reliance on this promise, I-Enterprise's predecessors-in-interest agreed to commit capital to the Funds.  I-Enterprise would not have agreed to commit capital to the Funds had the Individual Defendants (who marketed the Funds on their personal expertise) not agreed to remain actively involved in the management of the Funds.

139.    The Individual Defendants accepted and assented to this agreement and its inclusion in the Agreements.  The Individual Defendants prepared or directed the preparation of the Agreements, including the personal agreement that the Individual Defendants dedicate time to the management of the Funds.  The Individual Defendants knew that the Agreements contained this personal agreement. The Individual Defendants marketed their personal experience and involvement to I-Enterprise's predecessors-in-interest and knew that they would rely on the commitment of the

Individual Defendants to remain actively involved in making an investment in the Funds.
Accordingly, the Individual Defendants accepted the inclusion of the promise in the Agreements and
they are bound by it.  Both I-Enterprise and the Individual Defendants relied on the Agreements – I-
Enterprise by making its capital commitment and the Individual Defendants by managing the Funds.
The Individual Defendants are bound by the statement in the Partnership Agreements.

140.    Contrary to the requirements of the Agreements that the Individual Defendants
dedicate appropriate time to effectively manage the Funds, the Individual Defendants have failed to
dedicate appropriate time to Fund V and Fund VI and have instead pursued other interests to the
detriment of I-Enterprise.

141.    The Individual Defendants sponsored, marketed and raised additional large venture
capital funds that required substantial time commitments.  After raising Fund VI, the Individual
Defendants raised two funds to which they agreed to dedicate 100% of their time.

142.    Prior to investing all of the Committed Capital in Fund V, the Individual Defendants
were marketing and promoting Fund VI.  Shortly after Fund VI closed, the Individual Defendants
began marketing and promoting Fund VII (a $640 million fund).  In addition, the Individual
Defendants were raising another $690 million for a global technology fund, were acting as a sub-
adviser to a $330 million publicly traded venture fund, and were promoting seven or more regional
funds of $100 million or more each.

143.    These large sums of capital under management provided for significant, fixed fees to
the General Partners and in turn the Individual Defendants who received the benefit of these fees by
virtue of their equity ownership of the Fund General Partners.  The amount of capital under
management, however, also meant that the Individual Defendants had to invest vastly larger sums of
money than they had previously managed.  Because of the amount of capital under management by

the Individual Defendants and the speed with which they were investing, the Individual Defendants did not dedicate appropriate time to effectively manage Funds V and VI, thereby breaching their obligations to I-Enterprise and resulting in significant losses to I-Enterprise.  In addition, the size of the funds under management and the speed with which the Individual Defendants were investing resulted in the Individual Defendants failing to invest Funds V and VI in accordance with the investment objectives and practices represented to I-Enterprise.

144.    In addition to managing multiple large funds, various of the Individual Defendants have pursued other interests instead of dedicating appropriate time to effectively manage the Funds. One Managing Member, defendant Fisher, relocated to London for a substantial period of time to organize the global technology fund.  In so doing, Fisher did not dedicate appropriate time to the management and affairs of the partnerships in derogation of his duties.

145.    Another Managing Member, defendant Draper, spent a substantial portion of his time campaigning for a ballot initiative in California in 2000, rather than dedicating appropriate time to the affairs of the partnerships.

146.    The Fund V and VI Offering Memoranda stated that the Individual Defendants' "proven investment strategy" among other things "requires the individual Managing Directors of Draper Fisher Jurvetson to assume many board memberships."  The Individual Defendants breached this obligation.

147.    Contrary to the requirements of the Agreements, the Fund V and VI General Partners failed to notify I-Enterprise that the Individual Defendants had ceased being active in the management of the Funds.

148.    I-Enterprise has been damaged by the Individual Defendants failure to dedicate appropriate time effectively to manage the Funds.

**Conflicts of Interest and Self-Dealing**

149.    Upon information and belief, in violation of their duties, the Fund V and VI General Partners and the Individual Defendants have engaged in self-dealing and entered transactions giving rise to impermissible conflicts of interest, including but not limited to a) investing in affiliated companies without the requisite consent, b) engaging in personal transactions with shares of portfolio company stock, and c) making investments in later rounds of financing in portfolio companies of earlier DFJ funds to improve the valuations of those earlier DFJ funds. In addition, the Fund General Partners, the Individual Defendants and their agents have misappropriated and/or wasted partnership opportunities and/or assets. I-Enterprise has been damaged by this conduct.

**Detrimental Acts**

150.    The Funds V and VI General Partners and the Individual Defendants committed Detrimental Acts of which they failed to notify I-Enterprise. These Detrimental Acts included but are not limited to the following:

151.    As noted in paragraph 119, in March 2001, the Fund V General Partner took a 20% share of a March 2001 distribution of Cyras stock. A merger of Cyras into Ciena had been announced in which Cyras shareholders would receive shares of Ciena stock. In advance of the transaction, the Fund V General Partner purported to distribute Ciena stock and take for itself a 20% share. At the time, Fund V owned only Cyras stock, which was not publicly traded and therefore was not a distributable marketable security as to which the General Partner was entitled to take a 20% share. As noted in paragraph 132, the Fund V General Partner delayed recognizing losses on Eclipse, BestOffer, Third Voice, and Work Exchange, and delayed writing down investment values of various portfolio companies, including Brightlink, Everdream, Global Sight, Brodia, LiveAdvice,

ePocrates, Saltare, RealNames, Tacit, Digital Work, and eTang, to artificially satisfy the prerequisites of receiving 20% of the purported Ciena distribution.

152.    The Fund V General Partner diverted Fund monies for non-partnership purposes and to advance the interests of the Individual Defendants and other members of the Fund V General Partner.  Among other things, in 1998, the Fund V General Partner used $375,000 of Fund V monies to purchase shares of Wit Capital for a Fund V side-by-side fund whose members included the Individual Defendants and other members of the Fund V General Partner.  On July 1, 1999, Fund V used $1.59 million of Fund V monies to buy shares of Digital Impact for Fund IV, the members of the General Partner of which similarly included the Individual Defendants and other members of the Fund V General Partner.

153.    The Fund V and VI General Partners and the Individual Defendants misappropriated compensation and benefits received on account of board memberships in Fund portfolio companies, which should have been used to reduce management fees under the Agreements.  The compensation and benefits included directed shares and option grants.

154.    The Individual Defendants failed to dedicate appropriate time and attention to the Funds, as described in paragraphs 137 to 145 and agreed to dedicate 100% of their time to funds other than Funds V and VI barely a year into the ten year term of Fund VI.

155.    As described in paragraphs 90 to 102, the Fund V and VI General Partners failed to fund capital calls in the aggregate amount of more than $4.7 million.  In early 2000, they provided worthless long-term, nonrecourse notes for capital calls that they had not funded in 1998 and 1999. They ignored, and deliberately concealed from I-Enterprise their failure to make, capital calls in 2000, 2001, 2002, and 2003.  Their annual financial statements from 1998 to 2002 misrepresented that their capital contributions had been made.

156.     The Fund VI General Partner failed to return to the limited partners capital previously reserved for follow-on investments in portfolio companies which had failed.  Without telling the limited partners, the Fund VI General Partner instead embarked on a so-called "recovery program" to invest the freed up capital with changed investment objectives, and in conflict with investments DFJ was simultaneously making in Fund VII.

157.     Without obtaining the consent of all of the limited partners, the Fund VI General Partner used $10.9 million of Fund VI assets to purchase shares of Amazing Media, a company which was majority owned and controlled by affiliates of the Fund VI General Partner and the Individual Defendants.

158.     Without obtaining the consent of all of the limited partners, the Fund V General Partner used $3.45 million of Fund V assets to invest in Vizional, a company which was majority owned and controlled by affiliates of the Fund V General Partner and the Individual Defendants.

159.     The Fund VI General Partner invested over $5 million of Fund VI assets in meVC.com.  meVC.com was a mutual fund management company, not an information technology company of the type in which the Individual Defendants had represented Fund VI would invest.  It presented no opportunity for capital appreciation.  The only money meVC.com would make would be in the form of management and incentive fees, and an entity whose members included the Individual Defendants and other members of the Fund VI General Partner entered into a side agreement as "subadvisor" to siphon off most of those fees.

160.     The Fund VI General Partner also invested over $5 million of Fund VI assets at a very high valuation in Cambridge Incubator, similarly not an information technology company, to induce Cambridge Incubator to fund the startup costs and provide services to DFJ New England, a DFJ regional affiliate in which DFJ had an economic interest.

161.    The Fund V General Partner failed to follow the valuation procedures required by the Fund V Agreement, including but not limited to the requirements of Sections 12.1(c) and 12.2 involving the Advisory Committee.

162.    The Detrimental Acts committed by the Fund V and VI General Partners and the Individual Defendants were material breaches of contract.  The failures of the Fund V and VI General Partners to give notice of these and other Detrimental Acts to I-Enterprise deprived it of the opportunity in response, among other things (a) to withhold further capital contributions on account of such material contract breaches; (b) to sell its limited partnership interest in Fund V or VI; (c) to seek judicial dissolution of the Partnerships; or (d) to obtain a vote of two-thirds in interest of the limited partners to terminate the Partnerships.

### Additional Misrepresentations/Omissions

163.    The Funds V and VI General Partners and the Individual Defendants knowingly, recklessly, and/or negligently made materially false and misleading representations and failed to disclose material information to I- Enterprise's predecessor-in-interest necessary to make the statements in the Offering Memoranda not misleading to induce I-Enterprise's predecessor-in-interest's investment in Fund V and Fund VI.  In addition to the misrepresentations and omissions described above, the misrepresentations and omissions of the Funds V and VI General Partners and the Individual Defendants included the following:

164.    The Fund VI General Partner and the Individual Defendants failed to disclose that the Fund V General Partner had diverted Fund V monies for non-Partnership purposes, including that the Fund V General Partner in 1998 had used $375,000 of Fund V monies to purchase shares of Wit Capital for the Fund V side-by-side fund and in July 1999 had used $1.59 million of Fund V monies to buy shares of Digital Impact for Fund IV.

165.    The Fund VI General Partner and the Individual Defendants failed to disclose that the General Partners of prior DFJ funds and the Individual Defendants had misappropriated, and intended to continue to misappropriate, compensation and benefits, including directed shares and option grants, received on account of board memberships in prior fund portfolio companies that should have been used to reduce management fees under those funds' Agreements.

166.    The Fund VI General Partner and the Individual Defendants failed to disclose (a) that the valuation in the Fund VI Offering Memorandum of Fund V portfolio company Wit Capital, which constituted almost 70% of the value ascribed to Fund V, was not determined in accordance with the Fund V Agreement, even though it was the same valuation as appeared in the Q2 2000 quarterly report, which was supposed to be calculated in accordance with the Fund V agreement, and (b) that, if properly determined in accordance with the Fund V Agreement, the valuation of Wit Capital would have been approximately $62 million, not $161 million, and would have reduced the reported $176 million of total appreciation of Fund V by approximately $98.5 million, or over fifty-five percent.

167.    The Funds V and VI General Partners and the Individual Defendants made materially false and misleading statements and omitted to disclose material facts necessary to make the statements not misleading relating to the performance of the prior DFJ Funds, including return multiples, internal rates of return (IRR), so-called "if held" values, and other information about the performance and returns on investment of the Funds.

168.    The Individual Defendants misrepresented that they would follow an explicit investment strategy described at length in the Fund V and VI Offering Memoranda, while failing to disclose their purported beliefs, to which they testified, (a) that the Offering Memoranda did not bind them in any respect, (b) that many of the terms it used to describe the Funds' investment strategy

were vague and essentially meaningless, and (c) that the Fund V and VI General Partners had complete discretion to invest the Funds in any manner they chose.

169.    The Funds V and VI General Partners and the Individual Defendants failed to disclose that, at the time of the Fund VI closing, their "model" for Fund V and Fund VI contemplated limiting investments in portfolio companies to no more than 75% of committed capital, and reserving the remaining 25% for payment of management fees, with the result that the potential investment results of Fund V and Fund VI would be materially less than the results claimed in the Fund V and VI Offering Memoranda for Funds I-IV, which were not similarly limited.

170.    The Fund VI General Partner and the Individual Defendants failed to disclose the existence and terms of a side agreement entered into by them prior to the closing of Fund VI, prompted by discussion of one or more of them leaving DFJ, that, according to the Individual Defendants' testimony, required the Individual Defendants to devote only half their time to the business of all the DFJ funds combined, and guaranteed them each personally millions of Fund VI management fees even if they devoted no time to Fund VI at all.

171.    The Funds V and VI General Partners and the Individual Defendants failed to disclose other material facts concerning management fees and expenses that were necessary to make the representations made in the Funds V and VI Offering Memos about management fees and expenses not misleading, including but not limited to the following:

a.    That the Fund V and VI General Partners would take an annual management fee of 2.5% of capital they did not intend to contribute;

b.    That the Fund V and VI General Partners would set aside a reserve of 25% of committed capital to pay management fees and take an annual management fee of 2.5% on that reserved capital that they were not investing, and never intended to invest;

c.    That the Fund V and VI General Partners would take an annual management fee of 2.5% of capital they had lost through failed investments;

d.      That the Fund V and VI General Partners would take an annual management fee of 2.5% of capital invested and subsequently distributed to the limited partners;

e.      That the 2.5% management fee would consequently constitute a much greater percentage of capital actually under management;

f.      That the 2.5% annual management fee bore no relation to the operating expenses of the Fund, but instead generated enormous multi-million dollar profits for the General Partner regardless of the performance of the Funds;

g.      That having achieved liquidating and exit events for Funds V and VI, the Funds V and VI General Partners would nonetheless cause the Funds to hold liquid shares and cash, rather than distributing them to the limited partners, in order to pay management fees to the General Partners; and

h.      That the Fund V and VI General Partners would receive additional fees from affiliate DFJ funds for deal flow belonging to Funds V and VI.

## <u>Count I</u>
### <u>(Negligent Misrepresentation Against Fund V General Partner and the Individual Defendants)</u>

172.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 171 as if set forth fully herein.

173.    As alleged above, the Fund V General Partner and the Individual Defendants made material misrepresentations and/or failed to disclose material information to I-Enterprise in connection with the marketing of Fund V.

174.    The Fund V General Partner and the Individual Defendants failed to exercise reasonable care and competence in making such material misrepresentations and omissions.

175.    In particular, and not limited to the following, the Individual Defendants represented in the Fund V Offering Memorandum or in person, as alleged above, that they would:

a.      Invest in companies that were early stage, seed companies;

b.      Invest according to the stated per company investment limits;

c.      Spread risk by investing in many companies;

d.      Invest small initial amounts;

e.      Cut off the losers early;

f.      Conduct extensive due diligence and work closely with the portfolio companies; and

g.      Retain board seats in portfolio companies for short periods of time.

176.    In particular, and not limited to the following, the Fund V General Partner represented in the Fund V Partnership Agreement, that it would:

a.      Invest in companies that were early stage, seed companies;

b.      Invest according to the stated per company investment limits;

c.      Spread risk by investing in many companies;

d.      Invest small initial amounts;

e.      Cut off the losers early;

f.      Conduct extensive due diligence and work closely with the portfolio companies;

g.      Retain board seats in portfolio companies for short periods of time; and

h.      Make capital calls in cash or with full recourse demand notes.

177.    The Fund V General Partner and the Individual Defendants also made the material misrepresentations and failed to disclose the material facts described in paragraphs 163 to 171.

178.    These material representations were false and misleading and failed to disclose material information necessary to make the representations, under the circumstances in which they were made, not misleading.

179.    The misrepresentations and omissions were material to I-Enterprise's predecessor-in-interest's decision to invest in Fund V.

180.    The Fund V General Partner's and the Individual Defendants' misrepresentations and omissions were made for the purpose of inducing I-Enterprise's predecessor-in-interest to act by investing in Fund V.

181.    I-Enterprise's predecessor-in-interest acted upon the misrepresentations and omissions by investing in Fund V.

182.    The Fund V General Partner and the Individual Defendants had and breached a duty to I-Enterprise and its predecessor-in-interest, both of whom had a reasonable expectation of accuracy on the part of the Fund V General Partner and the Individual Defendants in providing information about Fund V.

183.    As a direct and proximate result of the Fund V General Partner's and the Individual Defendants' negligent misrepresentations and omissions, I-Enterprise was damaged.

**Count II**
**(Breach of Contract Against Fund V General Partner and the Individual Defendants)**

184.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 183 as if set forth fully herein.

185.    I-Enterprise and the Fund V General Partner were parties to a contract.

186.    By the conduct alleged above, the Fund V General Partner breached the contract.  In particular, and not limited to the following, the Fund V General Partner breached their contractual obligations with respect to a) making capital calls, b) following investment objectives and practices, c) taking a 20% distribution of Marketable Securities when the contractual prerequisites were not satisfied, d) failing to dedicate appropriate time to effectively manage the affairs of the partnership, and e) committing these and other Detrimental Acts of which it failed to give notice to the limited partners.

187.    The Individual Defendants agreed to certain terms in the Fund V Agreement and are parties thereto for those purposes.  In particular, and not limited to the following, the Individual Defendants agreed to dedicate appropriate time to manage effectively the affairs of the partnership

and agreed not to commit Detrimental Acts. The Individual Defendants breached their contractual obligations.

188.   I-Enterprise has performed all of its obligations under the contract.

189.   I-Enterprise was injured as a result of the Fund V General Partner's and the Individual Defendants' breaches.

## Count III
### (Breach of the Statutory and Implied Covenants of Good Faith and Fair Dealing Against Fund V General Partner and the Individual Defendants)

190.   I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 189 as if set forth fully herein.

191.   I-Enterprise and the Fund V General Partner were parties to a contract.

192.   As alleged above, the Individual Defendants agreed to certain terms in the Fund V Agreement and are parties thereto for those purposes.

193.   The contract contained an implied covenant of good faith and fair dealing.

194.   In addition, under California Corporation Code 16404(d), the Fund V General Partner owed I-Enterprise an obligation of good faith and fair dealing.

195.   By the conduct alleged above, the Fund V General Partner and the Individual Defendants breached the implied covenant and statutory obligation of good faith and fair dealing.

196.   I-Enterprise was injured as a result of the Fund V General Partner's and the Individual Defendants' breach of the implied covenant and statutory obligation of good faith and fair dealing.

## Count IV
### (Breach of Fiduciary Duty Against Fund V General Partner and the Individual Defendants)

197.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 196 as if set forth fully herein.

198.    The Fund V General Partner owes a fiduciary duty to I-Enterprise.

199.    As alleged above, the Individual Defendants owe fiduciary duties to I-Enterprise by virtue of being promoters and sellers of the limited partnership interest and by virtue of their relationship of trust and confidence with I-Enterprise.

200.    By the conduct alleged above, the Fund V General Partners and the Individual Defendants breached those fiduciary duties.  In particular, and not limited to the following, the Fund V General Partner and the Individual Defendants breached their fiduciary obligations with respect to a) acting in good faith and rendering a full and fair disclosure of all facts in connection with the offering and sale of interests in Fund V, b) making capital calls, c) following investment objectives, d) taking a 20% distribution of securities in certain circumstances, e) failing to dedicate appropriate time to effectively manage the affairs of the partnership, and f) committing these and other Detrimental Acts of which they failed to give notice to the limited partners.

201.    I-Enterprise was injured as a result of the Fund V General Partner's and the Individual Defendants' breaches of fiduciary duty.

### Count V
### (Conversion Against Fund V General Partner)

202.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 201 as if set forth fully herein.

203.    The Fund V General Partner exercised dominion over the property of I-Enterprise, namely, the securities to which I-Enterprise was entitled on the basis of its pro rata portion of 100% of distributions under the Fund V Agreement that the Fund V General Partner disproportionately distributed to itself.

204.   The Fund V General Partner's exercise of dominion was wrongful.

205.   The Fund V General Partner's exercise of dominion was in denial of I-Enterprise's right to possession of the distributions, or was inconsistent with that right.

206.   I-Enterprise was injured by the Fund V General Partner's wrongful exercise of dominion over its property.

## Count VI
### (Unjust Enrichment/Restitution Against Fund V General Partner)

207.   I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 206 as if set forth fully herein.

208.   I-Enterprise conferred a benefit on the Fund V General Partner by committing and contributing capital to Fund VI from which the Fund VI General Partner paid itself a management fee and received distributions.

209.   The Fund V General Partner knew of the benefit.

210.   I-Enterprise was induced to confer this benefit based on the representations made in the marketing of Fund V and in reliance on the promises made in the Fund V Agreement.

211.   As alleged above, the Fund V General Partner made misrepresentations to induce I-Enterprise's predecessors-in-interest's investment and has breached its contractual and other duties to I-Enterprise.

212.   Under such circumstances, the acceptance or retention of the Fund V General Partner of the benefit was under such circumstances as to make in inequitable for it to retain the benefit.

213.   I-Enterprise seeks restitution of the amounts paid to the Fund V General Partner as management fees and as distributions.

## Count VII
### (Accounting Against Fund V General Partner)

214.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 213 as if set forth fully herein.

215.    I-Enterprise is a limited partner in Fund V.

216.    As alleged above, the Fund V General Partner has breached its fiduciary duty to I-Enterprise.

217.    The partnership accounts are complicated.

218.    I-Enterprise is entitled to an accounting of the partnerships books and records.

## Count VIII
### (Fraud Against Fund VI General Partner and the Individual Defendants)

219.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 218 as if set forth fully herein.

220.    As alleged above, the Fund VI General Partner and the Individual Defendants knowingly and/or recklessly made material misrepresentations and/or failed to disclose material information to I-Enterprise's predecessor-in-interest in connection with I-Enterprise's predecessor-in-interest's investment in Fund VI.

221.    The Fund VI General Partner and the Individual Defendants represented in the Fund VI Partnership Agreement that the Fund VI General Partner would be making capital calls by cash or through full recourse demand promissory notes.  The Fund VI General Partner and the Individual Defendants represented in the Fund VI Offering Memorandum and Partnership Agreement that the General Partner would determine and allocate profits and losses in a specified manner.  These statements were false and misleading in that they failed to disclose that at the time of these representations were made, the Fund V General Partner was in breach of parallel provisions with respect to Fund V.

222.    As alleged above, the Fund VI Partnership Agreement and Offering Memorandum were delivered to I-Enterprise's predecessor-in-interest, Intercontinental Ventures LLC, on or about August 3, 1999 in Hingham, Massachusetts.

223.    The Fund VI General Partner and the Individual Defendants made these misrepresentations and/or omissions to induce I-Enterprise's predecessor-in-interest, Intercontinental Ventures LLC, to invest in Fund VI.

224.    I-Enterprise's predecessor-in-interest reasonably relied on these misrepresentations and omissions to its detriment in investing in Fund VI.

225.    The misrepresentations and omission were material to I-Enterprise's predecessor-in-interest's decision to invest in Fund VI.

226.    As a result of the misrepresentations and omissions of the Fund VI General Partner and the Individual Defendants, I-Enterprise and its predecessor-in-interest have been damaged.

## Count IX
### (Negligent Misrepresentation Against Fund VI General Partner and the Individual Defendants)

227.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 226 as if set forth fully herein.

228.    As alleged above, the Fund VI General Partner and the Individual Defendants made material misrepresentations and/or failed to disclose material information to I-Enterprise in connection with the marketing of Fund VI.

229.    The Fund VI General Partner and Individual Defendants failed to exercise reasonable care and competence in making such material misrepresentations and omissions.

230.    In particular, and not limited to the following, the Individual Defendants represented in the Fund VI Offering Memorandum or in person, as alleged above, that they would:

a.    Invest in companies that were early stage, seed companies;

b.      Invest according to the stated per company investment limits;

c.      Spread risk by investing in many companies;

d.      Invest small initial amounts;

e.      Cut off the losers early;

f.      Conduct extensive due diligence and work closely with the portfolio companies; and

g.      Retain board seats in portfolio companies for short periods of time.

231.    In particular, and not limited to the following, the Fund VI General Partner represented in the Partnership Agreement, as alleged above, that it would:

a.      Invest in companies that were early stage, seed companies;

b.      Invest according to the stated per company investment limits;

c.      Spread risk by investing in many companies;

d.      Invest small initial amounts;

e.      Cut off the losers early;

f.      Conduct extensive due diligence and work closely with the portfolio companies;

g.      Retain board seats in portfolio companies for short periods of time; and

h.      Make capital calls in cash or with full recourse demand notes.

232.    In addition, the Fund VI General Partner and the Individual Defendants touted a large return on a Fund V investment in Wit Capital, attributable primarily to the value of the security after the Wit Capital IPO, in the Fund VI Offering Memorandum.   The Fund VI General Partner and the Individual Defendants, however, failed to disclose that Wit Capital was being sued in connection with alleged irregularities in connection with other IPOs in which it had participated as an underwriter.

233.    The Fund VI General Partner and the Individual Defendants also made the material misrepresentations and failed to disclose the material facts described in paragraphs 163 to 171.

234.     These material representations were false and misleading and failed to disclose material information necessary to make the representations, under the circumstances in which they were made, not misleading.

235.     The misrepresentations and omissions were material to I-Enterprise's predecessor-in-interest's decision to invest in Fund VI.

236.     The Fund VI General Partner's and the Individual Defendants' misrepresentations and omissions were made for the purpose of inducing I-Enterprise's predecessor-in-interest to act by investing in Fund VI.

237.     I-Enterprise's predecessor-in-interest did so act upon the misrepresentations and omissions by investing in Fund VI.

238.     The Fund VI General Partner and the Individual Defendants had and breached a duty to I-Enterprise's predecessor-in-interest, which had a reasonable expectation of accuracy on the part of the Fund VI General Partner and the Individual Defendants in providing information about Fund VI.

239.     As a direct and proximate result of the Fund VI General Partner's and the Individual Defendants' negligent misrepresentations and omissions, I-Enterprise was damaged.

### Count X
### (Massachusetts Blue Sky Law Violation Against Fund VI General Partner and the Individual Defendants)

240.     I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 239 as if set forth fully herein.

241.     The Fund VI General Partner and the Individual Defendants are persons within the meaning of M.G.L. c. 110A, §401(h).

242.    The limited partnership interests in Fund VI purchased by I-Enterprise's predecessor-in-interest are securities within the meaning of M.G.L. c. 110A, §401(k).

243.    The sales of the limited partnership interests in Fund VI to I-Enterprise's predecessor-in-interest by the Fund VI General Partners and the Individual Defendants and Directors were sales within the meaning of M.G.L. c. 110A, §401(i)(1).

244.    The Fund VI General Partner and the Individual Defendants sold securities to I-Enterprise's predecessor-in-interest by means of one or more untrue statements of material fact or one or more omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

245.    In particular, and not limited to the following, the Individual Defendants represented in the Offering Memorandum or in person as alleged above, that they would do the following:

a.    Invest in companies that were early stage, seed companies;

b.    Invest according to the stated per company investment limits;

c.    Spread risk by investing in many companies;

d.    Invest small initial amounts;

e.    Cut off the losers early;

f.    Conduct extensive due diligence and work closely with the portfolio companies; and

g.    Retain board seats in portfolio companies for short periods of time.

246.    In particular, and not limited to the following, the Fund VI General Partner represented in the Partnership Agreement that it would do the following:

a.    Invest in companies that were early stage, seed companies;

b.    Invest according to the stated per company investment limits;

c.    Spread risk by investing in many companies;

d.      Invest small initial amounts;

e.      Cut off the losers early;

f.      Conduct extensive due diligence and work closely with the portfolio companies;

g.      Retain board seats in portfolio companies for short periods of time; and

h.      Make capital calls in cash or with full recourse demand notes.

247.    In addition, the Fund VI General Partner and the Individual Defendants touted a large return on a Fund V investment in Wit Capital, attributable primarily to the value of the security after the Wit Capital IPO, in the Fund VI Offering Memorandum.    The Fund VI General Partner and Individual Defendants, however, failed to disclose that Wit Capital was being sued concurrently in connection with alleged irregularities in connection with other IPOs in which it had participated as an underwriter.

248.    The Fund VI General Partner and the Individual Defendants also made the material misrepresentations and failed to disclose the material facts described in paragraphs 163 to 171.

249.    These statements were false and/or failed to state facts necessary to make the statements, under the circumstances made, not misleading.

250.    I-Enterprise's predecessor-in-interest did not know of the misrepresentations and/or omissions.

251.    The Fund VI General Partner and the Individual Defendants knew, or in the exercise of reasonable care could have known, of the misrepresentations and/or omissions.

252.    I-Enterprise has been injured by the misrepresentations and/or omissions made in the sale of securities by the Fund VI General Partner and the Individual Defendants.

253.    If I-Enterprise prevails on its claim under M.G.L. c. 110A, §410(a)(2), it will tender its limited partnership interest in Fund VI for the amount paid plus statutory interest before entry of judgment.

## Count XI
### (Breach of Contract Against Fund VI General Partner and the Individual Defendants)

254.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 253 as if set forth fully herein.

255.    I-Enterprise and the Fund VI General Partner were parties to a contract.

256.    By the conduct alleged above, the Fund VI General Partner breached the contract. In particular, and not limited to the following, the Fund VI General Partner breached its contractual obligations with respect to a) making capital calls and engaging in a continuous make-up of I-Enterprises' capital account, b) following investment objectives and practices, c) failing to dedicate appropriate time to effectively manage the affairs of the partnership, and d) committing these and other Detrimental Acts of which it failed to give notice to the limited partners.

257.    The Individual Defendants agreed to certain terms in the Agreement and are parties thereto for those purposes.  In particular, and not limited to the following, the Individual Defendants agreed to dedicate appropriate time to manage effectively the affairs of the partnership and agreed not to commit Detrimental Acts.  The Fund VI Individual Defendants breached their obligations.

258.    I-Enterprise has performed all of its obligations under the contract.

259.    I-Enterprise was injured as a result of the Fund VI General Partner's and the Individual Defendants' breaches.

## Count XII
### (Breach of the Statutory and Implied Covenants of Good Faith and Fair Dealing Against Fund VI General Partner and the Individual Defendants)

260.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 259 as if set forth fully herein.

261.    I-Enterprise and the Fund VI General Partner were parties to a contract.

262.    As alleged above, the Individual Defendants agreed to certain terms in the Agreement and are parties thereto for those purposes.

263.    The contract contained an implied covenant of good faith and fair dealing.

264.    In addition, under California Corporation Code 16404(d), the Fund V General Partner owed I-Enterprise an obligation of good faith and fair dealing.

265.    By the conduct alleged above, the Fund VI General Partner and the Individual Defendants breached the implied covenant of good faith and fair dealing.

266.    I-Enterprise was injured as a result of the Fund VI General Partner's and the Individual Defendants' breach of the implied covenant and statutory obligation of good faith and fair dealing.

### Count XIII
### (Breach of Fiduciary Duty Against Fund VI General Partner and the Individual Defendants)

267.    I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 266 as if set forth fully herein.

268.    The Fund VI General Partner owes a fiduciary duty to I-Enterprise.

269.    As alleged above, the Individual Defendants owe fiduciary duties to I-Enterprise by virtue of being promoters and sellers of the limited partnership interest and by virtue of their relationship of trust and confidence with I-Enterprise.

270.    By the conduct alleged above, the Fund VI General Partner and the Individual Defendants breached those fiduciary duties.  In particular, and not limited to the following, the Fund

VI General Partner and the Individual Defendants breached their fiduciary obligations with respect to a) acting in good faith and rendering a full and fair disclosure of all facts in connection with the offering and sale of interests in Fund V, b) making capital calls and engaging in a continuous make-up of I-Enterprises' capital account, c) following investment objectives and practices, d) failing to dedicate appropriate time to effectively manage the affairs of the partnership, and e) committing Detrimental Acts of which they failed to give notice to the limited partners.

271.     I-Enterprise was injured as a result of the Fund VI General Partner's and the Individual Defendants' breaches of fiduciary duty.

### Count XIV
### (Unjust Enrichment/Restitution Against Fund VI General Partner)

272.     I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 271 as if set forth fully herein.

273.     I-Enterprise conferred a benefit on the Fund VI General Partner by committing and contributing capital to Fund VI from which the Fund VI General Partner paid itself a management fee and received distributions.

274.     The Fund VI General Partner knew of the benefit.

275.     I-Enterprise was induced to confer this benefit based on the representations made in the marketing of Fund VI and in reliance on the promises made in the Agreement.

276.     As alleged above, the Fund VI General Partner made misrepresentations to induce I-Enterprise's investment and has breached its contractual and other duties to I-Enterprise.

277.     Under such circumstances, the acceptance or retention of the Fund VI General Partner of the benefit is inequitable.

278.     I-Enterprise seeks restitution of the amounts paid to the Fund VI General Partner as management fees and as distributions.

### Count XV
### (Accounting Against Fund VI General Partner)

279.     I-Enterprise repeats and incorporates the allegations in paragraphs 1 through 278 as if set forth fully herein.

280.     I-Enterprise is a limited partner in Fund VI.

281.     As alleged above, the Fund V General Partner has breached of fiduciary duty to I-Enterprise.

282.     The partnership accounts are complicated.

283.     I-Enterprise is entitled to an accounting of the partnerships books and records.

### Prayers for Relief

WHEREFORE, I-Enterprise prays that the Court grant the following relief:

a.     Judgment for I-Enterprise on all counts of this Counterclaim;

b.     An award of damages for defendants' fraud, negligent misrepresentations, breach of contract, breach of covenants of good faith and fair dealing, and breach of fiduciary duty;

c.     Restitution of the amounts paid to the Fund General Partners as management fees and distributions;

d.     Rescission of I-Enterprise's investment commitment and a return of the amounts contributed to Fund VI for violation of the Massachusetts Blue Sky Law and the California Unfair Business Practices Act;

e.     Return of the fees paid and distributions made to defendants during the period of the breaches of contract and duty;

f.     An accounting of the books and records of the partnerships;

g.     An award of attorneys fees, costs and interest; and

h.     Any further relief that this Court deems just and appropriate.

1

## Jury Claim

2

Plaintiff claims a trial by jury on all issues so triable.

3

4

Dated:         February 24, 2004                    I-ENTERPRISE COMPANY LLC

5                                                    By its attorneys,

6

7                                                    __/s/ John A.D. Gilmore_____
                                                     E. Randolph Tucker (BBO #503845)
8                                                    John A. D. Gilmore  (BBO #193060)
                                                     Bruce E. Falby  (BBO #544143)
9                                                    Kirsten M. Nelson  (BBO #634520)
                                                     DLA PIPER RUDNICK GRAY CARY US LLP
10                                                   One International Place
                                                     Boston, MA 02110-2600
11                                                   (617) 406-6000

12
                                                     David J. Romanski (SBN #073963)
13                                                   Gregory K. Jung (SBN #203350)
                                                     DLA PIPER RUDNICK GRAY CARY US
14                                                   LLP
                                                     333 Market Street, Suite 3200
15                                                   San Francisco, CA 94105-2150

16

17

18

19

20

21

22

23

24

25

26

27

28