United States District Court

For the Northern District of California

1
2
3
4
5
6
7               IN THE UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   I-ENTERPRISE COMPANY LLC,                No. C-03-1561 MMC

11          Plaintiff,                        **ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANTS'**
12                                            **MOTIONS FOR SUMMARY JUDGMENT;**
     v.                                       **VACATING HEARING**
13

14                                            (Docket Nos. 471, 472, 473)

15   DRAPER FISHER JURVETSON
     MANAGEMENT COMPANY V, LLC, et al.,
16
            Defendants
17   _____/

18        Before the Court are three separate motions for summary judgment, filed October

19   14, 2005 by, respectively:  (1) defendants Timothy C. Draper ("Draper"), John H.N. Fisher

20   ("Fisher"), and Stephen T. Jurvetson ("Jurvetson") (collectively, "individual defendants"); (2)

21   defendant Draper Fisher Jurvetson Management Company V, LLC ("DFJ-V"); and (3)

22   defendant Draper Fisher Jurvetson Management Company VI, LLC ("DFJ-VI").  Plaintiff

23   I-Enterprise Company LLC ("I-Enterprise") has filed a consolidated opposition to the three

24   motions.  The individual defendants, DFJ-V, and DFJ-VI have separately filed replies.[1]

25   Having considered the papers submitted in support of and in opposition to the motions, the

26

27        [1] The repeated cross-referencing used in defendants' motions and replies needlessly
     complicated the Court's review of the motions.  In light of the considerable overlap among
28   the motions, it would have been preferable had defendants sought leave to file a single
     motion in excess of the page limit provided in the Civil Local Rules.

Court finds the motions appropriate for decision without oral argument, see Civil L.R.
7-1(b), and hereby VACATES the November 18, 2005 hearing.  For the reasons set forth
below, the motions are GRANTED in part and DENIED in part.

## BACKGROUND

In 1998 and 1999, I-Enterprise, through its predecessors-in-interest, invested in two
venture capital funds, Draper Fisher Jurvetson Fund V L.P. ("Fund V") and Draper Fisher
Jurvetson Fund VI L.P. ("Fund VI") (collectively, "the Funds").  (See Fourth Amended
Complaint ("4AC") ¶¶ 1, 4.)  I-Enterprise alleges it has suffered more than $40 million in
damages as a result of defendants' fraudulent and negligent misrepresentations, breach of
contract, breach of fiduciary duty, state securities law violations, conversion, and unjust
enrichment.  (See id. ¶¶ 1, 3.)

Defendant DFJ-V is the general partner of Fund V.  (See id. ¶ 5.)  Defendant DFJ-VI
is the general partner of Fund VI.  (See id. ¶ 6.)  The individual defendants are managing
directors of DFJ-V and DFJ-VI.  (See id. ¶¶ 7-9.)  The individual defendants are also
general partners in the Draper Fisher Jurvetson general partnership ("DFJ").  (See id.)

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment as
to "all or any part" of a claim "shall be rendered forthwith if the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that the moving party is entitled to
judgment as a matter of law."  See Fed. R. Civ. P. 56(b), (c).  Material facts are those that
may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a
reasonable jury to return a verdict for the nonmoving party.  See id.  The Court may not
weigh the evidence.  See id. at 255.  Rather, the nonmoving party's evidence must be
believed and "all justifiable inferences must be drawn in [the nonmovant's] favor."  See
United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989)
(en banc) (citing Liberty Lobby, 477 U.S. at 255).

1    The moving party bears the initial responsibility of informing the district court of the

2    basis for its motion and identifying those portions of the pleadings, depositions,

3    interrogatory answers, admissions and affidavits, if any, that it contends demonstrate the

4    absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317,

5    323 (1986).  Where the nonmoving party will bear the burden of proof at trial, the moving

6    party's burden is discharged when it shows the court there is an absence of evidence to

7    support the nonmoving party's case.  See id. at 325.

8    Where the moving party "bears the burden of proof at trial, he must come forward

9    with evidence which would entitle him to a directed verdict if the evidence went

10   uncontroverted at trial."  See Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992)

11   (citations omitted); see also Fontenot v. Upjohn, 780 F.2d 1190, 1194 (5th Cir. 1986)

12   (holding when plaintiff moves for summary judgment on an issue upon which he bears the

13   burden of proof, "he must establish beyond peradventure all of the essential elements of

14   the claim . . . to warrant judgment in his favor.") (emphasis in original).

15   A party opposing a properly supported motion for summary judgment "may not rest

16   upon the mere allegations or denials of [that] party's pleading, but . . .  must set forth

17   specific facts showing that there is a genuine issue for trial."  See Fed. R. Civ. P. 56(e); see

18   also Liberty Lobby, 477 U.S. at 250.  The opposing party need not show the issue will be

19   resolved conclusively in its favor.  See Liberty Lobby, 477 U.S. at 248-49.  All that is

20   necessary is submission of sufficient evidence to create a material factual dispute, thereby

21   requiring a jury or judge to resolve the parties' differing versions at trial.  See id.

22   The district court is not required to search the record sua sponte for some genuine

23   issue of material fact.  See Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) ("It is not

24   our task, or that of the district court to scour the record in search of a genuine issue of

25   triable fact.  We rely on the nonmoving party to identify with reasonable particularity the

26   evidence that precludes summary judgment."); see also Carmen v. San Francisco Unified

27   School District, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine

28   the entire file for evidence establishing a genuine issue of fact, where the evidence is not

3

1   set forth in the opposing papers with adequate references so that it could conveniently be
2   found.")

3                                          **DISCUSSION**

4       **A.  Failure to Answer Third Amended Complaint**

5           As an initial matter, the Court addresses I-Enterprise's argument that defendants'
6   failure to "answer the allegations added by the Third Amended Complaint," (see Opp. at 30
7   n.10), requires the Court to find defendants have admitted those allegations.

8           The Third Amended Complaint was filed April 4, 2005.  On April 25, 2005,
9   defendants filed a motion to dismiss certain causes of action alleged in the Third Amended
10  Complaint.  Pursuant to Rule 12(a)(4)(A) of the Federal Rules of Civil Procedure, when a
11  motion to dismiss has been filed, the defendant is not required to answer the complaint until
12  ten days after the Court rules on the motion.  See Fed. R. Civ. P. 12(a)(4)(A).  On July 15,
13  2005, the Court granted the motion in part and denied it in part, and did not grant leave to
14  amend any of the dismissed claims.  Accordingly, defendants were required to answer the
15  complaint by July 29, 2005.  See id.; see also Fed. R. Civ. P. 6 (providing where "period of
16  time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and
17  legal holidays shall be excluded in the computation").  Defendants did not do so.

18          On August 19, 2005, I-Enterprise filed a motion for leave to file a Fourth Amended
19  Complaint, which motion the Court granted on September 12, 2005.  I-Enterprise filed its
20  Fourth Amended Complaint on September 13, 2005.  On September 26, 2005, defendants
21  filed a new motion to dismiss, which the Court granted in part and denied in part on
22  November 3, 2005.  Thereafter, on November 18, 2005, defendants timely answered the
23  Fourth Amended Complaint.

24          Although I-Enterprise is correct that statements in a complaint are deemed admitted
25  when not denied in the answer, see Fed. R. Civ. P. 8(d), none of the cases on which
26  I-Enterprise relies involve the instant situation, where a defendant fails to answer a
27  complaint but files a timely answer to an amended complaint.  The Ninth Circuit has held
28  that an "amended complaint supersedes the original, the latter being treated thereafter as

                                                4

non-existent."  See Loux v. Rhay, 375 F.2d 55, 57 (9th Cir. 1967). As the Third Amended

Complaint has been superseded by the Fourth Amended Complaint, and, consequently, is

deemed to be non-existent, and defendants have timely answered the allegations of the

Fourth Amended Complaint, the Court finds defendants' failure to answer the Third

Amended Complaint does not constitute an admission of any of the allegations of the Third

Amended Complaint.

### B. Negligent Misrepresentation Claims

Defendants move for summary judgment on I-Enterprise's claims for negligent

misrepresentation.  The elements of negligent misrepresentation are: (1) a representation

as to a past or existing material fact; (2) the representation was untrue; (3) the defendant

made the representation without any reasonable ground for believing it to be true; (4) the

representation was made with the intent to induce plaintiff to rely upon it; (5) the plaintiff

was unaware of the falsity of the representation, acted in reliance upon the truth of the

representation, and was justified in relying upon the representation; and (6) damages.  See

BAJI 12.45; see also Hydro-Mill Co., Inc. v. Hayward, Tilton and Rolapp Ins. Assoc., 115

Cal. App. 4th 1145, 1154 (2004) (noting elements of negligent misrepresentation are

"[m]isrepresentation of a past or existing material fact, without reasonable ground for

believing it to be true, and with intent to induce another's reliance on the fact

misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by

the party to whom it was directed; and resulting damage").

"To state a cause of action for negligent misrepresentation, plaintiff must allege facts

establishing that the defendant owed him a duty to communicate accurate information."

See Friedman v. Merck & Co., 107 Cal. App. 4th 454, 477 (2003).  I-Enterprise's claims for

negligent misrepresentation are based on alleged misrepresentations and omissions in the

Offering Memoranda and the Limited Partnership Agreements ("LPAs"), in connection with

the marketing of Funds V and VI.  (See 4AC ¶¶ 173, 230.)  "California courts have

recognized a cause of action for negligent misrepresentation, i.e., a duty to communicate

accurate information . . . where information is conveyed in a commercial setting for a

1    business purpose."  <u>See</u> <u>id</u>.  In addition, "a seller of a limited partnership interest owes a

2    fiduciary duty [to disclose all material facts] to the prospective purchaser of such an

3    interest."  <u>See</u> <u>Eisenbaum v. Western Energy Resources, Inc.</u>, 218 Cal. App. 3d 314, 322,

4    324 (1990).  Further, where "one is under no duty to speak, but yet undertakes to do so,

5    either voluntarily or in response to inquiry, he must make a full and fair disclosure and

6    conceal no facts within his knowledge which materially qualify those stated[.]"  <u>See</u> <u>Kuhn v.</u>

7    <u>Gottfried</u>, 103 Cal. App. 2d 80, 86 (1951).  Finally, general partners have a fiduciary duty

8    "to make a full and fair disclosure of all matters substantially affecting the value of the

9    partnership."  <u>See</u>, <u>e.g.</u>, <u>McCain v. Phoenix Resources, Inc.</u>, 185 Cal. App. 3d 575, 579

10   (1986).  Accordingly, under the circumstances presented in the instant case, I-Enterprise

11   has shown that defendants had a duty to communicate accurate information.

12                        **1.  Alleged Misrepresentations**

13          Defendants' first ground for dismissal is that I-Enterprise has no evidence that

14   defendants made any misrepresentations.  In response, I-Enterprise submits evidence of

15   the following asserted misrepresentations.

16                        **a.    DFJ's investment objectives and place in the venture**
                                  **capital market**

17

18          I-Enterprise contends that defendants made the following misrepresentations in the

19   Offering Memoranda for Funds V and VI with respect to DFJ's investment objectives and

20   position in the venture capital market:

21          – DFJ's "'franchise' has become synonymous with seed stage and start-up
             investing."  (<u>See</u> Greenstein Decl. Ex. 2 (Fund V Offering Memorandum ("Fund V
22           OM"), dated June 1998, at 6; Ex. 80 (Fund VI Offering Memorandum ("Fund VI
             OM"), dated June 1999, at 7.)

23          – "[ W]e will maintain our proven investment strategy, primarily consisting of:
             [¶] a resolve to assume higher risk than other firms – by investing at an earlier
24           stage – in order to obtain higher rewards; . . . [¶] a willingness to invest
             relatively small amounts into deals (true 'seed' deals); . . . [¶] [and] a resolve
25           to add value by working hard for our portfolio companies to position them for
             larger follow-on rounds of financing."  (<u>See</u> Fund V OM at 7; Fund VI OM
26           at 8.)

27          – "Our niche – designated as the 'seed,' or 'start-up,' or 'early' stage, and defined as
             a willingness to assume substantial risk by investing in unproven teams, markets
28           and technologies – is occupied by very few firms anywhere in the nation. Such

                                              6

positioning enables us to be the first professional investor in over 80% of our portfolio companies, a status that confers on us excellent pricing leverage on our deals.  Since few entrepreneurs are able to obtain professional funding, we have strong pricing leverage when we make initial investments in start-up companies. When, after building the management team, completing product development, refining strategies and tactics, and generally reducing investment risk, the time comes to obtain larger rounds of follow-on funding, we find that there is often strong interest among the many mainstream venture capital firms to invest in our deals." (See Fund V OM at 7; Fund VI OM at 8.)

– "The most compelling reasons for an investment in [Fund V and Fund VI] include . . . [¶] The niche we occupy – relatively small, early stage deals – is still relatively underserved."  (See Fund V OM at 11-12; Fund VI OM at 13.)

– There is a "void in the industry with few established firms and few experienced venture capitalists focusing on early stage investment opportunities.  It is precisely this gap which Draper Fisher Jurvetson fills." (See Fund V OM at 13; Fund VI OM at 14.)

– "There exist a handful of early stage venture funds, but we rarely encounter them in head-to-head competition."  (See Fund V OM at 19; Fund VI OM at 19.)

I-Enterprise argues that these statements, for several reasons, were untrue at the time they were made.

First, I-Enterprise argues the above-quoted statements were untrue because at the time they were made, the venture capital industry was in a period of unprecedented growth and change, and seed stage investing was no longer a "niche," nor was it "underserved." I-Enterprise submits no evidence, however, in support of this contention.  Rather, I-Enterprise relies on general testimony from Fisher's deposition that "industry dynamics changed dramatically from 1996 to 1999, like it was practically a different world."  (See Kent Decl. Ex. 2 (Fisher Dep.) 435:25-436:2.)

Second, I-Enterprise argues, DFJ's statements that it was a "seed stage" or "early stage" venture capital firm were no longer true at the time the Fund V and VI Offering Memoranda were distributed.[2]  With respect to the Fund V OM, however, I-Enterprise submits no evidence that such statements in the Fund V OM were false at the time they were made.  Rather, I-Enterprise relies on evidence of investments made by Fund V as

---

[2] As noted above, the Fund V OM is dated June 1998 and the Fund VI OM is dated July 1999.  (See Fund V OM at 1; Fund VI OM at 1.)

proof that such statements in the Fund VI OM were false at the time they were made.  In particular, I-Enterprise submits evidence that, by July 1999, eight of Fund V's eighteen investments had been made in Series B or higher rounds[3], including multi-million-dollar Series C investments in Net Zero, Wit Capital, Digital Work, and RealNames.  (See Rosenbaum Decl. ¶ 17.)  Rosenbaum attests that "66% of the monies invested by Fund V were invested in Series B or higher financings," and that "DFJ was the first professional investor in fewer than half of Fund V's investments as of July 31, 1999, and in only one-third of the investments with which DFJ rounded out the Fund by September 30, 1999." (See id. ¶¶ 18-20.)  In addition, although the Fund V OM stated that DFJ "typically invests between $500k and $2.5 million in seed/start-up rounds," (see Fund V OM at 23), Rosenbaum attests that by July 1999, Fund V "had written 8 initial investment checks greater than $2.5 million, with 2 of these checks exceeding $5,000,000."  (See Rosenbaum Decl. ¶ 23.)

With respect to Fund VI, Rosenbaum attests, 44% of that fund's "initial investments" were made in "10 later stage companies."  (See id. ¶ 22.)  In addition, although the Fund VI OM stated that DFJ "typically invests between $1 million and $5 million in seed/start-up rounds," (see Fund VI OM at 23), Rosenbaum attests that "Fund VI made 9 initial

---

[3] According to Paul Rosenbaum ("Rosenbaum"), an expert witness for I-Enterprise, "Series A and initial Common designations indicate seed and very early stage, while series B and higher indicate later stage financings."  (See Rosenbaum Decl. ¶ 15.)  Draper testified at deposition, however, that terms such as "early stage," "later stage," and "seed stage" "don't have a concrete definition."  (See Kent Decl. Ex. 1 at 377:6-17.)  Draper also disagreed with the statement that "later-stage opportunities are Series B and onwards," and testified that "'later stage,' 'Series B,' . . .  all have a variety of different understanding[s], so people have different understandings of what all these things mean."  (See id. at 376:17-25.)  An email from Draper, dated January 14, 2001, and addressed to someone uninvolved in the instant litigation, states: "Being early stage investors, we tend to invest in two guys and a dog."  (See Kent Decl. Ex. 69.)  Fisher testified at deposition that a seed stage investment was an investment in "a few individuals tinkering with a product to, perhaps, maybe two dozen people; and that once the product got farther along in terms of more management, more people, more critical mass in terms of a product," it would become an "early-stage" investment.  (See Kent Decl. Ex. 2 at 370:22-371:8.)  The Court nonetheless will assume for purposes of the instant motion that investments in "series B and higher" rounds are not "seed and early stage" investments.  (See Rosenbaum Decl. ¶ 15); see also Liberty Lobby, 477 U.S. at 255 (noting court, in ruling on motion for summary judgment, must view evidence in the light most favorable to nonmoving party).

1   investments where the $5 million upper number was exceeded," which constituted a total of

2   35% of all Fund VI monies invested.  (See id. ¶ 24.)

3       Accordingly, the Court finds I-Enterprise has raised a triable issue of material fact as

4   to whether the Fund VI Offering Memorandum, but not the Fund V Offering Memorandum,

5   misrepresented that DFJ was a "seed stage" or "early stage" venture capital firm.

6                      **b.    Due Diligence**

7       I-Enterprise challenges as untrue the description in the Fund V and Fund VI Offering

8   Memoranda of the due diligence in which DFJ engaged prior to making an investment.  The

9   Fund V and Fund VI Offering Memoranda state DFJ "has an eight-step procedure for due

10  diligence before making an investment decision," which include the following steps: (1)

11  "Read Plan/Assess Team"; (2) "Evaluate Market"; (3) "Examine Business Model"; (4)

12  "Check References"; (5) "Call Potential Customers"; (6) "Evaluate Product/Technology"; (7)

13  "Evaluate Risks/Rewards"; (8) "Decide."  (See Fund V OM at 20-21; Fund VI OM at 20-21.)

14  The Fund V and Fund VI Offering Memoranda state that DFJ invests in fewer than 1% of

15  the companies it examines.  (See Fund V OM at 20; Fund VI OM at 20.)  I-Enterprise

16  contends that the eight-step due diligence process featured in the Fund V and Fund VI

17  Offering Memoranda had been abandoned by the time the Fund V and Fund VI Offering

18  Memoranda were distributed.

19      In particular, I-Enterprise points to DFJ's 1999 investment in See-U-

20  There/TransComputing International ("TransComputing").[4]  I-Enterprise cites a letter dated

21  February 27, 1999, in which the president and CEO of TransComputing thanked Jurvetson

22  for his visit, (see Kent Decl. Ex. 43), and a follow-up letter dated March 3, 1999, in which a

23  TransComputing employee thanked Jurvetson "for conducting . . . due diligence so quickly

24  and making a decision in 'Internet time.'" (see id. Ex. 66), as evidence that DFJ could not

25  have performed the eight-step due diligence process described in the Fund V and Fund VI

26  Offering Memoranda.  I-Enterprise further submits evidence that Jurvetson received a

27  _____

28      [4] Although I-Enterprise, in its motion, identifies the company in question as "See-U-There," the documentation cited refers to the company as "TransComputing International."

9

"binder of due-diligence related-documents" with respect to TransComputing in correspondence dated March 4, 1999, after DFJ had already decided to invest in the company.  (See id. Ex. 43.)  There is no evidence before the Court that DFJ invested in the company prior to reviewing the due diligence materials, however.  Consequently, I-Enterprise has not demonstrated a triable issue as to whether DFJ failed to perform the promised due diligence with respect to this transaction.

I-Enterprise further notes that Jennifer Fonstad ("Fonstad"), a Fund V and Fund VI employee, testified at deposition that although "typically" she personally makes calls to references, she has delegated that duty to DFJ's "affiliate network" and "venture partners where possible," because "[t]here's quite a lot to do to really assess these opportunities, and [DFJ] often need[s] to do it under a fairly tight time frame."  (See Kent Decl. Ex. 4 (Fonstad Dep.) at 86:7-22.)  Such statement does not evidence a lack of due diligence, however, but rather demonstrates that DFJ obtains assistance from others to ensure that it can complete its due diligence in a timely manner.

I-Enterprise also points to a series of internal emails dated March 13, 2003, in which Fisher requested information concerning a $750,000 investment in CompassCare that was scheduled to close the following day.  (See Kent Decl. Ex. 49.)  In one of those emails, Fisher noted that the closing documents for the investment were on the desk of Mark Greenstein, the Chief Financial Officer for Funds V and VI, and stated: "[A]t least several of us partners around here don't have the first clue as to what the company does" and "[w]e, as fiduciaries, are obligated to be up to speed on every company for whom we write a check."  (See id.)  After receiving documentation about CompassCare in a followup email that same date, Fisher sent an additional email to "DFJ partners," reminding them that "it's important that everyone knows something about each of these co-investment deals before [DFJ] actually invest[s]."  (See id.)  Although the above-cited correspondence suggests certain difficulties in communication, nothing therein suggests that due diligence was not completed on the CompassCare investment.

I-Enterprise also notes that, with respect to a potential investment in Maptuit, Draper

1   sent the following email to Scott Johnson of DFJ New England, who had recommended the

2   investment:

> We ran it up the flagpole here at DFJ, and were universally opposed to it
> (except that John said he didn't want to be a bottleneck to your progress).
> Our question to you is, "Are you looking to us as a last line of defense here,
> or are we a rubber stamp, or something in between?"  If we are a last line of
> defense, we would advise you to use us as the bad guy and kill it.  If not, go
> ahead and do the deal.  If you do, know that we are trying to save you from
> doing a deal that may create a nightmare for you.  The founder's reputation
> being one of a long list of our concerns.

(See Kent Decl. Ex. 39.)  Fund VI ultimately did invest in Maptuit.  (See id. Ex. 1 (Draper

Dep.) at 552:13-15.)  Draper testified at deposition that "between the time [the email] was

written and the time we invested, we were in Boston; we saw the company and were very

impressed."  (See id. at 552:17-19.)  There is no evidence that defendants did not conduct

such due diligence prior to making the decision to invest in Maptuit.  Again, the evidence

does not raise a triable issue of material fact as to DFJ's alleged lack of due diligence.

Accordingly, summary judgment for defendants will be granted on I-Enterprise's

claim for negligent misrepresentation to the extent such claim is based on defendants'

alleged misrepresentations about its process for conducting due diligence prior to investing

in a company.

### c.   "Intention to Work Hard on Fund VI"

I-Enterprise argues that "[w]hile vigorously promoting their labor intensive, hands-on

approach to early-stage investing, the individual defendants actually intended to pursue

activities other than Fund VI, while continuing to reap increasingly large amounts of cash in

the form of management fees."  (See Opp. at 11.)  The Court previously has dismissed all

such claims.  (See Order Granting in Part and Denying in Part Defendants' Motion for

Partial Dismissal of Fourth Amended Complaint, filed November 3, 2005, ("November 2005

Order") at 5-7; see also Order Granting in Part and Denying in Part Defendants' Motion to

Dismiss Certain Counts of Third Amended Complaint and/or to Strike, Filed July 15, 2005,

("July 2005 Order") at 19-20.)

### d.   Prior Investments

11

1    I-Enterprise contends defendants made misrepresentations with respect to the

2  success of their prior investments in three companies, specifically, Parametric, Hotmail,

3  and Preview Travel.

4                                    **i. Parametric**

5    The Offering Memoranda for Fund V and Fund VI each state:

6        Another important reason why an early stage focus is alluring to us has to do
         with our notion of the "super deal" – a seed stage investment at a very low
7        valuation in a company that later becomes exceedingly valuable.  In his first
         fund Mr. Draper was a start-up investor in a three-man operation that became
8        Parametric Technology, now a publicly traded company with a market value
         of some $6 billion, and a deal in which Mr. Draper made more than 500 times
9        his money on the original investment.

10 (See Fund V OM at 8; Fund VI OM at 9.)[5]  The Offering Memoranda further state: "We are

11 avidly committed to early stage investing, knowing that while such 'super deals' are rare,

12 they are only available to early stage investors."  (See Fund V OM at 8; Fund VI OM at 9

13 (emphasis in originals).)  I-Enterprise argues that the emphasis on the "super deal" was

14 "critical to the overall investment proposition advertised in the Fund V and VI OMs," and

15 contends that the above-quoted statement as to Draper's investment in Parametric was

16 untrue because Draper was not "a start-up investor in a three-man operation that became

17 Parametric" and did not "ma[k]e more than 500 times his money on the original

18 investment."

19    With respect to whether Draper was a "start-up investor" in Parametric, I-Enterprise

20 notes that Parametric was incorporated in May 1985, and that, on October 27, 1986,

21 Parametric issued 580,000 shares of Series A stock to four investors, including at least one

22 other professional investor, S. Young Venture Fund I Limited Partnership; Draper was not

23 one of those initial investors.  (See Kent Decl. Ex. 41 (Parametric Form S-1, filed with SEC

24 Dec. 7, 1989) at 7, 59.)  On March 26, 1987 and May 14, 1987, Parametric sold a total of

25 2,918,000 shares of Series B stock to other investors including California Partners, which

26

27        [5] The Fund VI OM identifies the then-current value of Parametric as $7 billion.  In all
   other respects, the quoted statement is identical in the Offering Memoranda for the two
28 funds.

                                         12

1    later became DFJ Fund I.  (See id. at 59-60.)  Taking as true Rosenbaum's statement that

2    investments in Series B stock are "later stage financings," I-Enterprise has raised a triable

3    issue of fact as to whether defendants misrepresented that Draper was "a start-up investor"

4    in Parametric.[6]

5    　　　　I-Enterprise further argues that Draper did not make "more than 500 times his

6    money on the original investment" in Parametric.  On March 26, 1987, Fund I made its

7    original investment in Parametric, in which it purchased 136,000 shares at $1.25 per share,

8    for a total investment of $170,000.  (See id. at 59-60.)  On March 25, 1989, Fund I

9    purchased an additional 68,000 shares of Series C stock in Parametric at $1.50 per share,

10   for a total investment on that date of $102,000.  (See id. at 60.)  "500 times" an investment

11   of $170,000 is $85 million; 500 times $272,000 (the amount of Fund I's total investment in

12   Parametric) is $136 million.  I-Enterprise points to financial records it identifies as records of

13   Fund I, showing that the original March 26, 1987 investment in Parametric was sold on July

14   1, 1989 at its original cost, and that the March 25, 1989 Series C investment in Parametric

15   also was sold at cost.[7]  (See id. Ex. 54 at DFJ123137 at lines 410-411.)  When Draper was

16   asked at deposition whether he made $85 million on Fund I's initial investment in

17   Parametric and $136 million on Fund I's total investment in Parametric, he testified that he

18   did not know.  (See Kent Decl. Ex. 1 (Draper Dep.) at 487:12-25.)

19   　　　　Although the Fund I records cited above indicate the Parametric investment was

20   sold at cost, the Fund V and Fund VI Offering Memoranda contain statements to the

21   contrary.  Appendix B to the Fund V Offering Memorandum states that Fund I's $272,000

22   investment in Parametric was sold for $26,846,000, which is 98.7 times the original

23   investment, and that the value of that investment, if the stock had been held until June

24

---

25   　　　[6] The Court notes, however, that Appendix C to the Offering Memoranda does state
     that Fund I's investment in Parametric was not in the "1st Professional Round."  (See Fund
26   V OM App. C at IEC01000; Fund VI OM App. C at IEC01376.)

27   　　　[7] Although defendants argue I-Enterprise's statement that the Parametric shares
     were sold at cost is incorrect, (see Fund V Reply at 9), they offer no evidence to the
28   contrary.

1   1998, was more than $170 million, i.e., 626.6 times the original investment.  (See Fund V

2   OM App. B at B-1 - B-2.)  Appendix B to the Fund VI Offering Memorandum states that

3   Fund I's $272,000 total investment in Parametric was worth $22,930,700 "at Distribution,"

4   or 84.3 times the original investment.  (See Fund V OM App. B at B-2/3; Fund VI OM App.

5   B-2/3.)  When asked about these numbers at deposition, Draper testified that he did not

6   know how the numbers were calculated, but that he knew "they were accurate at the time"

7   and that they may have been calculated on an "as-if-held basis."  (See Kent Decl. Ex. 1

8   (Draper Dep.) at 486:2-488:9).  A trier of fact could conclude that the statements in the text

9   of the Offering Memoranda that Draper "made more than 500 times his money on the

10  original investment," (see Fund V OM at 8; Fund VI OM at 9), are misleading, in light of the

11  discrepancies in the evidence as to the actual dollar amount obtained from Fund I's sale of

12  its Parametric shares and that none of the differing figures shows that Draper "made more

13  than 500 times his money on the original investment."

14      Accordingly, the Court finds I-Enterprise has raised a triable issue of material fact as

15  to whether the statements in the Offering Memoranda for Fund V and Fund VI that Draper

16  was "a start-up investor" in Parametric, and that "Draper made more than 500 times his

17  money on the original investment," constitute misrepresentations.

18                          **ii.  Hotmail**

19      The Fund VI Offering Memorandum contains the following statement about Fund III's

20  investment in Hotmail: "Fund III invested $300k in the seed round of Hotmail Corporation,

21  an investment that became worth 200 times that amount 22 months later, and over 350

22  times by 6/30/99."  (See Fund VI OM at 9.)  I-Enterprise contends the above-quoted

23  statement is untrue.[8]

24  _____

25      [8] Defendants note that I-Enterprise has never previously argued the Hotmail
    investment was a basis for any of its claims and that it failed to identify the Hotmail
26  investment, in its discovery responses, as the basis for any of its claims.  Consequently,
    defendants argue, I-Enterprise should be barred from asserting this theory for the first time
27  in opposition to defendants' motion for summary judgment.  In light of the policy in favor of
    amending complaints, however, see Fed. R. Civ. P. 15(a), and as defendants do not claim
28  to have been prejudiced by I-Enterprise's late assertion of the claim, the Court finds
    I-Enterprise is not barred from raising this theory.  See Eminence Capital, LLC v. Aspeon,

1    As I-Enterprise points out, the Fund III Quarterly Report for the quarter ended June

2    30, 1999 states that its investment in Hotmail was then worth approximately $103 million,

3    based on a total investment of $3.3 million, not based on the $300,000 initial investment as

4    stated in the Fund VI Offering Memorandum.  (See Kent Decl. Ex. 45 at 1.)  $103 million is

5    approximately 31.2 times the $3.3 million total cost of the investment, and approximately

6    343 times the $300,000 initial investment.  If the statement in the Fund III Quarterly Report

7    is true, the $103 million figure includes the return on $3 million in shares purchased after

8    the initial investment, and one could not say that the $300,000 initial investment alone was

9    worth 350 times that amount on June 30, 1999.  When asked about the ten-fold difference

10   between the description of Fund III's Hotmail investment set forth in the Fund VI Offering

11   Memorandum, as compared to the description of the same investment in the Fund III

12   Quarterly Report, Jurvetson testified: "I think what I would say is that I'm confused by the

13   sentence [in the Fund VI Offering Memorandum], and I think any investor reading it would

14   ask us for clarification before investing with us."  (See Kent Decl. Ex. 3 (Jurvetson Dep.) at

15   648:12-15.)  Draper testified at deposition that he believed the statements in both

16   documents are correct, but was unable to explain how to reconcile the two statements.[9]

17   (See Kent Decl. Ex. 1 (Draper Dep.) at 288:2-293:7.)

18   Accordingly, the Court finds I-Enterprise has raised a triable issue of material fact as

19   to whether defendants misrepresented in the Fund VI Offering Memoranda that Fund III's

20   $300,000 initial investment in Hotmail was worth 350 times that amount by June 30, 1999.

21

22                              **iii.  Preview Travel**

23

24   Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) (stating that in determining whether to allow
     amendment, "the consideration of prejudice to the opposing party carries the greatest
25   weight").

26        [9] Although defendants purport, in the Fund VI Reply, to show how the initial
     investment of $300,000 was worth $107 million as of June 30, 1999, more than 356 times
27   the initial investment, the documents cited do not support that claim.  Defendants'
     argument also fails to explain why the Fund III Quarterly Report for the quarter ended June
28   30, 1999 states that its investment in Hotmail was then worth approximately $103 million on
     a total investment of $3.3 million.  (See Kent Decl. Ex. 45 at 1.)

                                          15

1    With respect to Preview Travel, the Offering Memoranda for Fund V and Fund VI

2  states "[w]e were seed investors in 1994 with . . . Preview Travel," and further states that

3  Fund I invested in Preview Travel in the "1st Professional Round."  (<u>See</u> Fund V OM at 9

4  and App. C at C2; Fund VI OM at 11 and App. C at C2.)  I-Enterprise contends that both of

5  these statements are untrue.

6    In particular, I-Enterprise asserts that Fund I's original investment in Preview Travel

7  was a "small fraction of a later-stage Series C round in 1991 by Kleiner Perkins Caufield &

8  Byers," (<u>see</u> Opp. at 19); I-Enterprise submits no evidence in support of this contention.

9  I-Enterprise also points out, however, that earlier Offering Memoranda, for Funds III and IV,

10  stated that Fund I's investment in Preview Travel was not in the "1st Professional Round,"

11  (<u>see</u> Kent Decl. Ex. 52 (Fund III Offering Memorandum) App. C at C-3; Kent Decl. Ex. 34

12  (Fund IV Offering Memorandum) App. C at C3); these appendixes were changed for

13  inclusion in the Fund V and Fund VI Offering Memoranda to state that Fund I invested in

14  Preview Travel in the "1st Professional Round."  (<u>See</u> Fund V OM App. C at C2; Fund VI

15  OM App. C at C2.)  Defendants offer no explanation for the discrepancy.

16    Accordingly, the Court finds I-Enterprise has raised a triable issue of material fact as

17  to whether defendants misrepresented in the Fund V and Fund VI Offering Memoranda that

18  they were "seed investor[s]" and investors in the "1st Professional Round" of Preview

19  Travel.

20    **e.    Failure to Disclose Diversion of Fund V Monies**

21    I-Enterprise contends that defendants, in the marketing of Fund VI, failed to disclose

22  that they had diverted Fund V monies to purchase shares of Wit Capital and Digital Impact

23  for others, rather than investing the money for the benefit of the limited partners of Fund V.

24    Specifically, I-Enterprise contends that on September 11, 1998, DFJ used $375,000

25  of Fund V money to purchase shares of Wit Capital for "themselves, friends, and family

26  members."  (<u>See</u> Opp. at 20.)  I-Enterprise submits evidence that, on September 11, 1998,

27  $5 million was transferred from Fund V to Wit Capital for the "Series C Shareholder"

28  Account, and that as of September 17, 1998, that money had been used to purchase

$4,625,000 in Wit Capital shares for Fund V, and $375,000 in such shares for Draper

Fisher Jurvetson Partners, LLC.  (See Kent Decl. Exs. 19, 20.)  I-Enterprise further submits

interrogatory responses from Fund V, in which Fund V states that, on September 11, 1998,

it granted a "[s]hort-term loan of $375,000 from Fund V to Partners V for Wit Capital

financing," and further states that said loan was repaid on October 14, 1998.  (See Kent

Decl. Ex. 56 at 10:19-22.)  Additionally, Fund V states that on November 23, 2004, it was

paid $2,113.65 in interest for the above-referenced loan.  (See id. at 10:23-24.)

I-Enterprise submits evidence that if Fund V had received the benefit of the above-

referenced $375,000 investment, it would have earned an additional $3.9 to $4.9 million by

the beginning of 2000.  (See Greenfield Decl. Ex. 14 (Fund V Q3 1999 Report) at IEC0504

(showing Wit Capital stock purchased 9/11/98 increased in value from $1.43 to $18.25 per

share); see also id. Ex. 17 (Fund V Q1 2000 Report) at IEC0567 (showing Wit Capital stock

at $17.125 per share); Ex. 15 (Fund V Q4 1999 Report) at IEC0513 (showing Wit Capital

stock at $17.00 per share)).

    I-Enterprise also submits evidence that defendants used Fund V funds to purchase

Digital Impact stock for Fund IV.  Specifically, I-Enterprise submits interrogatory responses

from Fund V, in which Fund V stated that, on July 1, 1999, it granted a "[s]hort-term loan of

$1,590,300 to Fund IV for investment in Digital Impact," that the loan was repaid on

September 9, 1999, and that Fund IV, on July 20, 2004, paid Fund V $16,468 in interest on

the above-referenced loan.  (See Kent Decl. Ex. 56 at 9:20-25.)

    As I-Enterprise notes, Fund V's Rule 30(b)(6) witness, Mark Greenstein, testified at

deposition: "I don't believe a loan should normally be made between funds."  (See Kent

Decl. Ex. 5 at 125:6-7.)[10]  I-Enterprise fails to identify, however, any statement made by

defendants that was rendered untrue as a result of their failure to disclose the above-

referenced uses of Fund V monies.

---

    [10]   When Draper was asked at deposition whether he thought there was "any
problem, from a fiduciary point of view, in Fund V lending money to Fund VI," he testified: "I
think we are well within contract to do that."  (See Kent Decl. Ex. 1 at 556:12-18.)

1    Consequently, summary judgment for defendants will be granted on I-Enterprise's

2   claim for negligent misrepresentation, to the extent such claim is based on defendants'

3   failure to disclose they had diverted Fund V monies to purchase shares of Wit Capital and

4   Digital Impact for others, rather than investing the money for the benefit of the limited

5   partners of Fund V.  See BAJI 12.45 (noting negligent misrepresentation claim requires

6   proof of untrue representation as to past or existing material fact); see also Byrum v. Brand,

7   219 Cal. App. 3d 926, 940-942 (1990) (rejecting contention that "negligent

8   misrepresentation may be shown where a fiduciary fails or omits to disclose certain

9   material facts"); Vega v. Jones, Day, Reavis & Pogue, 121 Cal. App. 4th 282, 291 n.6

10  (2004) (noting claim for negligent misrepresentation "requires a positive assertion").

### f.    Failure to Disclose Misappropriation of "Compensation and Benefits" Belonging to Fund V

12    I-Enterprise contends defendants failed to disclose that Netzero offered Fund V

13  employee Jennifer Fonstad ("Fonstad") 25,000 directed shares[11] in Netzero that Fonstad

14  took as her own rather than treating as a Fund V asset.  Fonstad testified at deposition that

15  she offered the shares to others, including her daughter and nanny, and could not recall

16  whether she had made the shares available to Fund V.  (See Kent Decl. Ex. 4 (Fonstad

17  Dep.) at 471:8-25, 473:2-11; see also Kent Decl. ¶ 74 (Document entitled "Netzero, Inc.

18  Directed Share Program").

19    I-Enterprise contends the Fund V LPA establishes that the right to obtain directed

20  shares is an asset of the fund.[12]  Section 6.1(d) of the Fund V LPA provides that the

21  management fees paid by Fund V to the General Partner "shall be reduced by the amount

22  of any directors' fees (including net after-tax proceeds obtained by the General Partner or

23  the Managing Members in connection with the exercise of stock options and sale of the

---

[11] According to I-Enterprise, directed shares of a company give the holder the right to purchase the company's stock at the initial offering price.  (See Opp. at 21.)

[12] Although I-Enterprise refers to the "Fund VI LPA," (see Opp. at 21), the Court fails to see the relevance of the Fund VI LPA to a determination of what constitutes an asset of Fund V, and assumes I-Enterprise intended to refer to the Fund V LPA.

1   underlying shares), consulting fees, break-up fees, investment banking fees or other

2   equivalent compensation (other than direct reimbursement of out-of-pocket expenses)

3   received by the General Partner, any of the Managing Members or any of their respective

4   Affiliates from any company or entity in which the Partnership has an interest."  (See

5   Greenstein Decl. Ex. 4 (Fund V LPA) at 9 ¶ 6.1(d).)  The above-quoted paragraph of the

6   Fund V LPA reasonably could be construed to require that the amount of management fees

7   paid by Fund V be reduced by the net after-tax proceeds obtained by the General Partner

8   or the Managing Members as a result of their acquisition of directed shares from any

9   company in which Fund V has an interest.

10        Again, however, I-Enterprise has not identified any statement made by defendants

11   that was rendered untrue as a result of their failure to disclose the above-referenced use of

12   directed shares.  As discussed in the previous section, a "positive assertion" of material fact

13   is a prerequisite to a claim for negligent misrepresentation.  Consequently, summary

14   judgment for defendants will be granted on I-Enterprise's claim for negligent

15   misrepresentation, to the extent said claim is based on the above-alleged omission.

16                          **g.     Capital Calls**

17        I-Enterprise contends that defendants made repeated misrepresentations about the

18   General Partners' capital contributions to Fund V and Fund VI.  The LPAs for both Fund V

19   and Fund VI require the General Partner of each of those Funds to make certain capital

20   contributions to the funds "in cash or by full recourse demand promissory note."  (See

21   Greenstein Decl. Ex. 4 (Fund V LPA) ¶ 4.3; Greenstein Decl. Ex. 87 (Fund VI LPA) ¶ 4.3.)

22   Although the financial statements for the funds repeatedly represented that "[t]he General

23   Partner's capital contributions were made in the form of demand promissory notes" or "non-

24   interest bearing promissory notes,"[13] Greenstein, the Fund V and Fund VI CFO, testified at

25

26        [13] See Greenstein Decl. Ex. 54 (1998 Fund V Financial Statements) at IEC00434; id.
27   Ex. 55 (1999 Fund V Financial Statements) at IEC0408; id. Ex. 58 (2000 Fund V Financial
     Statements) at IEC00395; id. Ex. 59 (2001 Fund V Financial Statements) at IEC00536; id.
28   Ex. 60 (2002 Fund V Financial Statements) at ML DF 0346); Greenstein Decl. Ex. 114
     (1999 Fund VI Financial Statements) at IEC01238).

deposition that as of December 2002, DFJ-V had not furnished any promissory notes to Fund V, and that he had been aware of the lack of promissory notes since the end of 1999. (See Kent Decl. Ex. 5 (Greenstein Dep.) at 242:9-244:3.)  In his declaration, Greenstein attests that the DFJ-V did execute one promissory note in 1999, albeit in the wrong form, but failed to execute promissory notes for thirteen capital calls between January 2000 and January 2003.  (See Greenstein Decl. ¶¶ 83-85.)  With respect to Fund VI, Greenstein attests that DFJ-VI executed one promissory note on or about December 31, 1999, albeit using the wrong form of note, and thereafter failed to execute any promissory notes for "approximately eighteen capital contributions that were called between January 2000 and 2003."  (See Greenstein Decl. ¶¶ 152-155.)

In late December 2002, I-Enterprise began to make inquiries of DFJ with respect to the operation of Funds V and VI.  (See Roy Decl. ¶ 8.)  In that regard, Maureen Herbert ("Herbert"), an I-Enterprise employee, sent an email to Greenstein on December 6, 2002, in which she requested "copies of a couple signed Fund V and Fund VI GP Capital Contribution notes."  (See Kent Decl. Ex. 22 at DJF112134.)  In an email dated December 13, 2002, Greenstein told Herbert: "We'll have an example pulled from our files and sent to you."  (See Kent Decl. Ex. 24 at DFJ112183.)  At deposition, Greenstein testified that no executed notes existed at that time with respect to either fund, and that he had a note created in order to send a copy to her.  (See Kent Decl. Ex. 5 at 251:6-22, 247:9-248:2.)  In January 2003, Greenstein attests, DFJ-V and DFJ-VI executed demand full recourse promissory notes representing all capital contributions they owed as of that date.  (See Greenstein Decl. ¶¶ 86, 155.)

Based on this evidence, a reasonable trier of fact could conclude that defendants misrepresented, in the Fund V and Fund VI Financial Statements, that the General Partners had executed promissory notes as their capital contributions.  Accordingly, the Court will deny defendants' motion for summary judgment as to I-Enterprise's claim for negligent misrepresentation, to the extent such claim is based on misrepresentations about the General Partners' capital contributions to Fund V and Fund VI.

1

**h.  Other Alleged Misrepresentations**

2      Defendants' motions also seek summary judgment on I-Enterprise's claims to the

3   extent such claims are based on certain other alleged misrepresentations.  I-Enterprise has

4   submitted no opposition thereto.  These claims are discussed below.

5

**(i) IRRs**

6      I-Enterprise alleges defendants misrepresented, <u>inter</u> <u>alia</u>, the internal rates of return

7   ("IRR") of the prior DFJ funds.  (<u>See</u> 4AC ¶ 167.)  Defendants contend that I-Enterprise

8   cannot establish that the IRR information contained in the Offering Memoranda was false or

9   misleading, in light of the disclosure in Appendix B of the method used to calculate IRRs,

10   and the testimony of I-Enterprise's own expert that there is more than one proper method

11   for calculating IRRs.  (<u>See</u> Fund V OM App. B at B-1; Fund VI OM App. B at IEC01368B-1;

12   <u>see</u> <u>also</u> Wanger Decl. Ex. 42 (Puntillo Dep.) at 66:21-23.)  Moreover, Draper, Fisher, and

13   Jurvetson all attest that the statements and calculations in the Offering Memoranda about

14   IRRs were true at the time they were made.  (<u>See</u> Draper Decl. ¶ 15; Fisher Decl. ¶ 14;

15   Jurvetson Decl. ¶ 14.)  As I-Enterprise has offered no evidence to the contrary, the Court

16   will grant defendants' motion for summary judgment on the issue of whether it made

17   misrepresentations in the Offering Memoranda with respect to IRRs.

18

**(ii) Calculation of Management Fees**

19      I-Enterprise alleges that defendants failed to disclose various facts concerning the

20   calculation of management fees and expenses that were necessary to make the

21   representations about management fees in the Offering Memoranda not misleading.  (<u>See</u>

22   4AC ¶ 171.)  The Offering Memoranda state that "[t]he annual management fee will be

23   equal to 2.5% of the committed capital of the Partnership . . . payable quarterly, in

24   advance." (<u>See</u> Fund V OM at D-6; Fund VI OM at D-6.)  Each of the individual defendants

25   attests that the Offering Memoranda accurately described how the management fees would

26   be calculated and paid.  (<u>See</u> Draper Decl. ¶ 27; Fisher Decl. ¶ 25; Jurvetson Decl. ¶ 25.)

27   As I-Enterprise has offered no evidence to the contrary, the Court will grant defendants'

28   motion for summary judgment on the issue of whether it made misrepresentations in the

1  Offering Memoranda with respect to the calculation of management fees.

2  **(iii) Valuation of Wit Capital**

3  I-Enterprise alleges that the valuation of Fund V portfolio company Wit Capital, as

4  set forth in the Fund VI Offering Memorandum, "was not determined in accordance with the

5  Fund V Agreement," and that it was overvalued by nearly $100 million.  (See 4 AC ¶ 166.)

6  Defendants submit evidence that they calculated the value of Wit Capital in precisely the

7  manner I-Enterprise's expert testified was the appropriate valuation method.  (See Draper

8  Decl. ¶ 30; Fisher Decl. ¶ 28; Jurvetson Decl. ¶ 28; Wanger Decl. Ex. 44 (Porter Dep.) at

9  57:8-58:16.)  As I-Enterprise has offered no evidence to the contrary, the Court will grant

10  defendants' motion for summary judgment on the issue of whether it made

11  misrepresentations in the Fund VI Offering Memorandum with respect to the valuation of

12  Wit Capital.

13  **i.      Summary**

14  In sum, I-Enterprise has raised a triable issue as to whether defendants made the

15  following alleged misrepresentations: (1) statements in the Fund VI OM that DFJ was a

16  "seed stage" or "early stage" venture capital firm; (2) statements in the Offering Memoranda

17  for Fund V and Fund VI that Draper was "a start-up investor" in Parametric, and that

18  "Draper made more than 500 times his money on the original investment" in Parametric; (3)

19  the statement in the Fund VI Offering Memoranda that Fund III's $300,000 initial investment

20  in Hotmail was worth 350 times that amount by June 30, 1999; (4) statements in the Fund

21  V and Fund VI Offering Memoranda that defendants were "seed investors" and investors in

22  the "1st Professional Round" of Preview Travel; (5) statements in the Fund V and Fund VI

23  Financial Statements that the General Partners had executed promissory notes as their

24  capital contributions.

25

26  **2.  Reliance on Misrepresentations in Offering Memoranda**

27  Defendants argue that I-Enterprise cannot rely on any misrepresentations in the

28

22

1   Offering Memoranda because each of the LPAs contains an integration clause.[14]

2   Defendants' argument is not persuasive.  The alleged negligent misrepresentations in the

3   Offering Memoranda are statements of existing fact to which the integration clause has no

4   application, e.g., defendants' statements that DFJ is a "seed stage" or "early stage" venture

5   capital firm, and their various statements about the success of prior investments.

6   Consequently, unless I-Enterprise was unreasonable in relying on such statements at the

7   time it entered into the LPAs, the statements, assuming the other elements of a cause of

8   action for negligent misrepresentation are met, are actionable.

9        In that regard, as the Court noted in a prior order, the LPAs state that "in making an

10  investment decision investors must rely on their own examination of the issuer and the

11  terms of the offering, including the merits and risks involved."  (See Order Granting in Part

12  and Denying in Part LLC Defendants' Motion to Dismiss; Granting Individual Defendants'

13  Motion to Dismiss, filed October 23, 2003, ("October 2003 Order") at 11 (quoting Fund V

14  LPA at 31 and Fund VI LPA at 35)).  The Court went on to hold that it could not "find, as a

15  matter of law, that I-Enterprise unreasonably relied on statements in the offering

16  memoranda, when the limited partnership agreement itself instructed investors to rely on

17  the terms of the offering."  (See id. at 12-13.)[15]  Accordingly, defendants are not entitled to

18  summary judgment on the ground I-Enterprise's claims are barred by the integration

19  clause.[16]

20  _____

21      [14] The Fund V and Fund VI LPAs both contain a provision that the agreement
    "constitutes the full, complete, and final agreement of the Partners and supersedes all prior
22  agreements between the Partners with respect to the Partnership."  (See Greenstein Decl.
    Ex. 4 (Fund V LPA) § 15.11; Greenstein Decl. Ex. 87 (Fund VI LPA) § 15.11.)

23      [15] In addition, as I-Enterprise notes, the Fund VI Subscription Agreement provides:
    "The undersigned agrees to subscribe for the Limited Partnership Interests pursuant to the
24  terms of the Confidential Private Offering Memorandum and the attachments, exhibits, or
    amendments thereto, if any[.]"  (See Greenstein Decl. Ex. 81 (Fund VI Subscription
25  Agreement) at IEC01316.)

26      [16] To the extent I-Enterprise may be asserting a fraud claim, see infra, based on a
    theory of a promise made without intent to perform, the Court need not decide whether the
27  integration clause precludes I-Enterprise from relying on such promise.  The only arguable
    promise alleged concerns defendants' investment strategy.  (See Fund V OM at 7; Fund VI
28  OM at 8.) For the reasons set forth infra, however, any claim based on such promise is

1

### 3.  Statute of Limitations

2        Defendants argue that certain of I-Enterprise's misrepresentation claims are barred

3    by the statute of limitations.  Both parties agree that such claims are governed by the three-

4    year statute of limitations, set forth in California Code of Civil Procedure § 338(d), for claims

5    based on fraud or mistake.  The parties disagree, however, as to whether inquiry notice or

6    actual notice of the alleged misrepresentations is sufficient to trigger the running of the

7    statute of limitations.

8        Under California statutory law, a cause of action for fraud or mistake "is not to be

9    deemed to have accrued until the discovery, by the aggrieved party, of the facts

10   constituting the fraud or mistake."  See Cal. Code Civ. Proc. § 338(d).  Courts, however,

11   have "read into the statute a duty to exercise diligence to discover the facts."  See Parsons

12   v. Tickner, 31 Cal. App. 4th 1513, 1525 (1995).  As defendants point out, the California

13   Supreme Court has held, in a suit alleging claims for fraud and negligent misrepresentation,

14   that inquiry notice is sufficient to trigger the running of the statute of limitations set forth in

15   § 338(d).  See Miller v. Bechtel Corp., 33 Cal. 3d 868, 875 (1983) (noting that if plaintiff

16   therein "became aware of facts which would make a reasonably prudent person suspicious,

17   she had a duty to investigate further, and she was charged with knowledge of matters

18   which would have been revealed by such an investigation").

19       Plaintiff, for its part, relies on Eisenbaum v. Western Energy Resources, Inc., 218

20   Cal. App. 3d 314 (1990).  In Eisenbaum, the California Court of Appeal held that, in cases

21   involving a fiduciary relationship between the parties, "facts which ordinarily require

22   investigation may not incite suspicion" and "the usual duty of diligence to discover facts

23   does not exist"; consequently, "the limitations period does not begin to run until plaintiff

24   actually discovers the facts constituting the cause of action, even though the means for

25

26

27   _____

28   time-barred.

24

obtaining the information are available."  See id.[17]  In Miller, however, the Supreme Court

expressly considered the argument made by the plaintiff therein that she had no duty of

inquiry because the defendant had a fiduciary duty to provide her with full and correct

information, and held such plaintiff nonetheless had a duty to investigate if she became

aware of facts that would "make a reasonably prudent person suspicious," and that she

was "charged with knowledge of matters which would have been revealed by such an

investigation."  See id. at 875; see also Parsons, 31 Cal. App. 4th at 1526 (noting § 338(d)

discovery rule "is generally applicable to confidential or fiduciary relationships").

Accordingly, the Court concludes that the statute of limitations began to run at such time as

I-Enterprise was made aware of facts that would have made a reasonably prudent person

suspicious and an investigation into the matter would have revealed the asserted

misrepresentation.  See Miller, 33 Cal. 3d at 875.[18]

### a. Investment Objectives

Defendants argue that I-Enterprise knew or should have known that Fund V had

deviated from the investment objectives set forth in the Fund V Offering Memorandum

before I-Enterprise invested in Fund VI.  In particular, defendants note that Rosenbaum,

I-Enterprise's own expert, acknowledges in his report that, by July 1999, the date of the

Fund VI OM, the Fund V Quarterly Reports had disclosed that eight out of eighteen

investments made by Fund V were in Series B or higher rounds.  (See Wanger Decl. Ex. 36

(Rosenbaum report) at 17.)  Defendants further point out that the 1998 and 1999 Fund V

Financial Statements identify the round in which Fund V invested in each of the companies

in which it invested.  (See Greenstein Decl. Ex. 54 at IEC00427; id. Ex. 55 at IEC0400-

0403.)  Defendants further note that the Fund VI Offering Memorandum expressly

disclosed that defendants, in their prior funds, did not always invest in the "1st professional

---

[17] In Eisenbaum, the Court of Appeal was not interpreting § 338(d), but, rather, the one-year statute of limitations set forth in California Corporations Code § 25507(a).  See id. at 321.

[18] Although the Court previously has cited Eisenbaum, (see July 2005 Order at 18), the California Supreme Court's decision in Miller is controlling authority on this issue.

round."  (See Fund VI OM App. C.)  Defendants also argue that the Fund VI Offering

Memorandum and the Fund V Quarterly Reports disclosed that Fund V repeatedly had

exceeded the typical maximum initial investment. (See Fund VI OM at IEC 01374; see also

Fund V OM at 23; Greenstein Decl. Exs. 10-13 (Fund V Quarterly Reports from Q3 1998

through Q2 1999.)  Defendants contend such disclosures put I-Enterprise on notice, more

than three years before the instant action was filed,[19] that Fund V had deviated from its

stated investment objectives, and that, accordingly, I-Enterprise's negligent

misrepresentation claims based on misrepresentations about investment objectives should

be dismissed as time-barred.

　　　　Defendants attest that Fund V and Fund VI Quarterly Reports were sent to all limited

partners, and that I-Enterprise's Quarterly Reports were sent to Roy's counsel and broker,

at the request of Roy's counsel.  (See Greenstein Decl. ¶¶ 21, 24, 112, 115.)  In response,

I-Enterprise argues that the Fund V Quarterly Reports were sent only to its counsel and its

broker at Merrill Lynch; Roy attests that he "did not receive all quarterly or annual reports

from Fund V or Fund VI in a timely fashion" and that DFJ "first sent a significant number of

them to [Roy] when requested around November 2002."  (See Roy Decl. ¶ 7; see also

Greenstein Decl. Ex. 81 (letter to DFJ-VI, dated July 26, 1999, from counsel to

I-Enterprise's predecessor, Intercontinental Energy Corporation, requesting that he and

Greg Simmons of Merrill Lynch be copied on all notices issued by the Fund); Kent Decl. Ex.

10 (email from Janette Shutts of DFJ stating that Roy is "never mailed the info" and that the

"only contact information [she had] ever received is for Peter DeFeo and Greg Simmons").

Roy acknowledges in his declaration, however, that his deposition testimony as to whether

he regularly received and reviewed reports from defendants reflected "some confusion" as

to whether he had received and reviewed all such reports  (See Roy Decl. at 4 n.1; see

also, e.g., Kent Decl. Ex. 9 (Roy Dep.) at 539:9-13 ("I think it's reasonable to assume I

---

[19] Defendants filed the instant action April 11, 2003, seeking declaratory relief.
I-Enterprise filed its counterclaim July 23, 2003.  The parties were realigned by stipulation
and order filed January 28, 2005.

1   received many of them, but which ones I received in the normal course of business and

2   which ones [counsel] got from Draper Fisher at a later time, I don't know."); id. at 763:2-10

3   ("[D]uring discovery we have learned that Draper Fisher says they never sent me quarterly

4   reports").

5           As defendants correctly note, even if the quarterly reports were sent only to Roy's

6   lawyer and broker, such individuals were acting as Roy's agents, and any notice provided

7   to them on Roy's behalf was imputed to Roy.[20]  See Capron v. State of California, 247 Cal.

8   App. 2d 212 (1966) (finding, under predecessor to § 338(d), claim time-barred due to

9   knowledge of plaintiffs' agent); see also Cal Civ. Code § 2332 ("As against a principal, both

10  principal and agent are deemed to have notice of whatever either has notice of, and ought,

11  in good faith and the exercise of ordinary care and diligence, to communicate to the

12  other."); Knapp v. Doherty, 123 Cal. App. 4th 76, 95 (2004) (citing § 2332; finding client had

13  notice of trustee's sale where notice provided to bankruptcy counsel); Columbia Pictures

14  Corp. v. De Toth, 87 Cal. App. 2d 620, 630 (1948) (holding "principal is charged with and is

15  bound by the knowledge of, or notice to, his agent received while the agent is acting within

16  the scope of his authority and which is with reference to a matter over which his authority

17  extends," irrespective of whether agent actually communicates the matter to principal).

18  Accordingly, the Court finds that Roy is charged with knowledge of the contents of

19  documents about the funds that were sent to his lawyer and broker.

20          I-Enterprise next argues, relying on two Ninth Circuit cases, that there are triable

21  issues of fact as to what conclusions should be drawn from the receipt of such reports.  As

22  I-Enterprise notes, in Briskin v. Ernst & Ernst, 589 F.2d 1363 (9th Cir. 1978), the district

23  court granted summary judgment for the defendant in a federal securities fraud action on

24  the ground the claim was time-barred[21] due to the plaintiffs' receipt of certain documents;

25  _____

26  [20] In addition, I-Enterprise has cited no authority requiring defendants to provide their
    limited partners with multiple copies of reports.

27  [21] Although the complaint in Briskin alleged a claim for violation of § 10(b) of the
28  Securities Exchange Act of 1934, the Ninth Circuit applied the statute of limitations set forth
    in the predecessor to § 338(d).  See id. at 1365.

the Ninth Circuit reversed, finding a triable issue as to whether the information contained in the documents was sufficient to make a reasonably prudent person suspect fraud.  See id. at 1368.  In that regard, the Ninth Circuit stated, "A trial judge should not assign conclusive legal effect to such documents at the summary-judgment stage when there can be a genuine difference of opinion as to their impact on a reasonable person."  See id. at 1368. Similarly, in Gray v. First Winthrop Corp., 82 F.3d 877, 881 n.3 (9th Cir. 1996), the Ninth Circuit noted that even when statements at issue are contained in undisputed documents, the jury still may need "to evaluate 'investor reasonableness' in light of the documents and other relevant evidence."  As Gray further observed, however, "the specificity of the information given is a relevant factor in determining when a reasonable investor should begin to investigate the possibility of fraud in an investment."  See Gray, 82 F.3d at 882.

I-Enterprise argues that the Court cannot hold as a matter of law that the limited information contained in the Quarterly Reports and Financial Statements was sufficient to put I-Enterprise on notice that defendants may have misrepresented their intent to make seed-stage investments.  The Court disagrees.  Of the seven investments listed in the Fund V Q4 1998 Quarterly Report, for example, Rosenbaum identifies five as being non-seed stage investments: Cyras, Eclipse, Global Sight, Brodia/Transactor Networks, and Wit Capital.  (See Wanger Decl. Ex. 36 (Rosenbaum report) at 17.)  The Fund V Q4 1998 Quarterly Report expressly discloses that four of those five investments were made in a Series B or higher round, which, Rosenbaum attests, is the definition of a later stage investment.  (See Greenstein Decl. Ex. 11 at IEC00416; see also Rosenbaum Decl. ¶ 15.) The Fund V Financial Statements for 1998 and 1999 likewise expressly disclose whether each investment was made in a Series B or higher round.  (See Greenstein Decl. Ex. 54 at IEC00427; id. Ex. 55 at IEC0400-0403.)  A reasonable investor concerned about whether defendants were investing in seed stage investments would have been put on notice by these disclosures that defendants frequently invested in Series B or higher rounds, which, according to plaintiff's own expert, are not seed stage investments.  See, e.g., Davis v. Birr, Wilson & Co., 839 F.2d 1369, 1370 (9th Cir. 1988) (finding § 10(b) claim time-barred under

28

1    predecessor to Cal. Code Civ. Proc. § 338(d) where investor received monthly reports and

2    consequently was made aware of challenged transactions more than three years before

3    filing suit).  Accordingly, as I-Enterprise received such disclosures more than three years

4    before it filed its claims in the instant action, the Court finds I-Enterprise's negligent

5    misrepresentation claims, to the extent such claims are based on misrepresentations in the

6    Fund VI OM that DFJ was a "seed stage" or "early stage" venture capital firm, are time-

7    barred.

8         Defendants additionally argue that the Fund VI Offering Memorandum and the

9    Fund V Quarterly Reports disclosed that Fund V repeatedly had exceeded the typical

10   maximum initial investment.  (See Fund VI OM at IEC 01374; see also Greenstein Decl.

11   Exs. 10-13 (Fund V Quarterly Reports from Q3 1998 through Q2 1999.)  With respect to the

12   Offering Memorandum, the chart on the cited page of the Fund VI Offering Memorandum

13   does not indicate whether the "cost" of the investments listed therein refers to the initial

14   investment or the total investment in those companies.  The Fund V Quarterly Reports, on

15   the other hand, state the dollar amount of each new investment.  (See, e.g., Greenstein

16   Decl. Ex. 10 (Fund V Q3 1998 Quarterly Report) at IEC00472, 474, 476 (noting $4.6 million

17   investment in Wit Capital); Greenstein Decl. Ex. 11 (Fund V Q4 1998 Quarterly Report) at

18   IEC00410, 412, 414,416) (noting $4.63 million investment in Eclipse, $3.52 million

19   investment in Tacit Knowledge, and $4.63 million investment in Transactor Networks)).  A

20   reasonable investor concerned about the size of Fund V's transactions would be hard-

21   pressed not to notice that the amounts invested repeatedly exceeded the typical maximum

22   initial investment.  Accordingly, because I-Enterprise was aware, more than three years

23   before filing its claims in the instant lawsuit, that Fund V's initial investments often

24   exceeded the amount of its stated typical maximum initial investment, the Court finds that

25   I-Enterprise's negligent misrepresentation claims, to the extent such claims are based on

26   misrepresentations about the size of initial investments, is time-barred.

27        Accordingly, defendants' motion for summary judgment as to I-Enterprise's negligent

28   misrepresentation claims, to the extent such claims are based on misrepresentations about

29

1  investment objectives, will be granted.[22]

2          **b.  Capital Calls**

3          Defendants argue that I-Enterprise was "on actual notice regarding the improper

4  form of notes contributed by the General Partner over three years before it brought its

5  claims."  (See Fund V Motion at 15.)  Defendants point out that the 1999 Fund VI Financial

6  Statements disclosed that "the general partners' capital contributions have been paid in the

7  form of non-interest bearing promissory notes due upon the earlier of 30 days after the

8  termination of the Partnership or 10 days after the sale of the securities collateralizing the

9  notes," (see Greenstein Decl. Ex. 114 at IEC01238), rather than being made "in cash or by

10 full recourse demand promissory notes," as required by the Limited Partnership

11 Agreements, (see Fund V LPA ¶ 4.3; Fund VI LPA ¶ 4.3).  As discussed above, however, it

12 is undisputed that most of the required notes were not prepared at all until I-Enterprise

13 requested copies of the executed notes.  Although the disclosures in the Financial

14 Statements may have put I-Enterprise on notice that the General Partners had executed a

15 different type of note than required, they did not put I-Enterprise on notice that, in the

16 majority of instances, no note in fact was executed in any form.

17         Accordingly, the Court finds defendants have not shown as a matter of law that

18 I-Enterprise's negligent misrepresentation claims, to the extent such claims are based on

19 misrepresentations about the General Partners' execution of promissory notes, are time-

20 barred.[23]

21         **4.  Business Judgment Rule**

22         Defendants argue that the business judgment rule exculpates them from liability for

23 any misrepresentations, on the ground that the evidence establishes they acted "in

24

25         [22] As a result of this ruling, the Court does not reach defendants' additional argument
26 that I-Enterprise waived any claim based on misrepresentation of investment objectives,
   and unduly delayed in bring a claim for rescission based on such asserted
27 misrepresentations.

28         [23] To the extent I-Enterprise may be asserting a claim based on the form, rather than
   the absence, of any note, such claim is time-barred.

30

accordance with their exercise of good faith business judgment and/or advice obtained from counsel and accountants regarding <u>all</u> of the conduct underlying I-Enterprise's negligence claims."[24]   (<u>See</u> Fund V Motion at 17-18 (emphasis in original).)

Defendants note that the business judgment rule, as set forth in California Corporations Code § 309, precludes a corporate director from being held liable for acting "in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." <u>See</u> Cal. Corp. Code § 309.  Defendants additionally note that a corporate director is entitled to rely on advice from counsel and independent accountants as long as "the director acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted." <u>See</u> <u>id</u>.

Defendants cite no case, however, in which the business judgment rule has been held to bar liability for negligent misrepresentation.  Negligent misrepresentation is a form of fraud.  <u>See</u> Cal. Civ. Code § 1710.  The business judgment rule protects "well-meaning directors who are misinformed, misguided, and honestly mistaken."  <u>See</u> <u>Biren v. Equality Emergency Medical Group, Inc.</u>, 102 Cal. App. 4th 125, 137 (2002).  The policy behind the business judgment rule would not be served by its application to the claims herein. Moreover, the business judgment rule applies only where the defendant has acted with "such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances," <u>see</u> Cal. Corp. Code § 309, whereas a requisite element of a claim of negligent misrepresentation is that the defendant made a statement "without reasonable ground for believing it to be true," <u>see</u> <u>Hydro-Mill</u>, 115 Cal. App. 4th at 1154.

Accordingly, the Court finds the business judgment rule does not preclude liability for

---

[24] Contrary to defendants' assertion, I-Enterprise does not allege "negligence" claims, but rather alleges claims for negligent misrepresentation.

1  defendants' alleged misrepresentations.

2  ### 5. Investigation Clause in Fund VI Subscription Agreement

3  Defendants argue they cannot be held liable for any misrepresentations in the Fund

4  VI Offering Memorandum because, with respect to Fund VI only, I-Enterprise represented,

5  in the Subscription Agreement for that fund, that it had investigated the accuracy of all

6  statements in the Offering Memorandum and was satisfied that the information provided

7  therein was clear and accurate.  The Subscription Agreement for Fund VI, which was

8  signed by Roy on July 26, 1999, provides, in relevant part:

9  The undersigned has consulted an attorney, accountant or other tax advisor
   with respect to this investment and it is understood that all documents,
10  records and books pertaining to this investment have been made available for
   inspection to such attorney, accountant or advisor and the undersigned.  The
11  undersigned and the undersigned's attorney, accountant or advisor have had
   the opportunity to obtain any additional information requested necessary to
12  verify the accuracy of the contents of the Memorandum, and to confer with a
   person authorized to act on behalf of the Partnership concerning the terms
13  and conditions of the Memorandum and any additional information requested
   which was supplied to the undersigned or the undersigned's attorney,
14  accountant or advisor, and all such questions have been answered to the full
   satisfaction of the undersigned, none of which answers is in any way
15  inconsistent with the Memorandum and the attachments thereto.

16  (See Greenstein Decl. Ex. 81 (Fund VI Subscription Agreement) § 1(e).)  Draper, Fisher,

17  and Jurvetson all attest that although Roy visited the DFJ offices in June 1999, he did not

18  ask them any questions about the content of the Fund VI Offering Memorandum.  (See

19  Draper Decl. ¶ 26; Fisher Decl. ¶ 24, Jurvetson Decl. ¶ 24.)

20  The Court agrees with I-Enterprise, however, that the above-quoted clause from the

21  Subscription Agreement does not necessarily constitute a representation that all of the

22  statements in the Offering Memorandum are correct, but, rather, is susceptible of the

23  interpretation that I-Enterprise had the opportunity to obtain information about the

24  statements in the Offering Memorandum and that it did not receive any information that was

25  inconsistent with the statements therein.  As discussed above, the Court cannot find, as a

26  matter of law, that the documents available to I-Enterprise put it on notice as to any

27  misrepresentations in the Offering Memoranda, other than those related to investment

28  objectives.  Accordingly, a trier of fact could conclude that I-Enterprise reasonably relied on

1   misrepresentations in the Offering Memoranda despite the language of the above-quoted

2   clause in the Subscription Agreement.  See, e.g., Salinas v. Souza & McCue Construction

3   Co., 66 Cal. 2d 217, 224 (1967), overruled on other grounds, Helfend v. Southern California

4   Rapid Transit District, 2 Cal. 3d 1, 14 (1970))  (finding contractor could reasonably rely on

5   city's misrepresentations about soil conditions, despite contractual provision that contractor

6   had "fully, thoroughly, and completely examined, inspected, and familiarized itself with all

7   matters and things relating to said contract").

8           Accordingly, the Court finds the above-quoted clause in the Subscription Agreement

9   does not bar I-Enterprise's negligent misrepresentation claims to the extent such claims are

10   based on misrepresentations in the Fund VI Offering Memorandum.

11                       **6. Damages/Rescission**

12           Defendants argue that I-Enterprise has no evidence of damages resulting from its

13   claims for negligent misrepresentation.  In response, I-Enterprise states it "is not seeking

14   damages with respect to its negligent misrepresentation and fraud in the inducement for the

15   diminution of its investment, but instead is seeking rescission and restitution because, had

16   Defendants not made the misrepresentations, [I-Enterprise] never would have invested in

17   the first place."  (See Opp. at 55.)  Defendants argue that I-Enterprise cannot seek

18   rescission because, having sold stock distributed by the funds,[25] I-Enterprise is unable to

19   restore everything of value it received under the contract.  I-Enterprise fails to address this

20   argument in its opposition.

21           Under California law, a party seeking rescission of a contract must give notice of

22   rescission "promptly upon discovering the facts which entitle him to rescind" and "[r]estore

23   to the other party everything of value which he has received from him under the contract or

24   offer to restore the same upon condition that the other party do likewise, unless the latter is

25   unable or positively refuses to do so."  See Cal. Civ. Code § 1691.  As noted, defendants

26   _____

27           [25] Defendants submit evidence that Fund V has distributed approximately $9.7
    million worth of stock to I-Enterprise and its predecessors, and that Fund VI has distributed
28   approximately $2.4 million worth of stock to its limited partners.  (See Greenstein Decl.
    ¶¶ 93,161.)

1   contend I-Enterprise sold the stock that was distributed by the Funds, (see Fund VI Motion

2   at 11; Fund V Reply at 13).  The portions of the deposition cited in support thereof contain

3   no such testimony, however.  (See Wanger Decl. Ex. 33 (Blakey Dep.) at 73:19-74:12.)  If

4   defendants can prove I-Enterprise sold some of the stock distributed by the funds,

5   I-Enterprise's claims for rescission would be barred, even if I-Enterprise offered to return

6   the cash proceeds it received from the sale of the stock.  See Dreiske v. Los Angeles Inv.

7   Securities Corp., 13 Cal. App. 2d 59, 62 (1936) (quoting Bailey v. Fox, 78 Cal. 389 (1889))

8   ("Upon a rescission the defendant, before paying back the purchase money and delivering

9   up the notes, was entitled to receive the identical things sold.  He was not bound to take the

10  price at which they were sold.  That might, so far as we know, have been less than their

11  value.").  Nevertheless, as defendants have cited no evidence that I-Enterprise sold any of

12  the stock distributed by the funds, the Court finds defendants have not established, as a

13  matter of law, that I-Enterprise is barred from seeking rescission by reason of its inability to

14  restore to defendants everything of value received under the contract.

15          **C. Fraud Claim**

16          Defendants move for summary judgment on the fraud claim asserted against DFJ-VI

17  and the individual defendants[26] for the same reasons set forth above with respect to the

18  claims for negligent misrepresentation.  As defendants, in their arguments, make no

19  distinction between the negligent misrepresentation claims and fraud claim, the Court's

20  rulings as set forth above apply equally to the fraud claim, except to the extent such claim

21  is based on alleged omissions.  To the extent defendants raise additional arguments solely

22  with respect to the fraud claim, such arguments are addressed separately infra.

23          **1. Omissions**

24          As noted, a claim for negligent misrepresentation must be based on a "positive

25  assertion."  See Vegas v. Jones, Day, Reavis & Pogue, 121 Cal. App. 4th at 291 n.6.  By

26  contrast, a fraud claim, under certain circumstances, can be based on omissions,

27

28          [26] No fraud claim is asserted against DFJ-V.

34

specifically, "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." See Limandri v. Judkins, 52 Cal. App. 4th 326 (1997).  Accordingly, the Court will address separately the merits of I-Enterprise's fraud claim to the extent it is based on nondisclosure of material facts.

### a. Failure to Disclose Diversion of Fund V Monies

As discussed above, I-Enterprise contends defendants engaged in fraud in the marketing of Fund VI by not disclosing that they had diverted Fund V monies to purchase shares of Wit Capital and Digital Impact for others, rather than investing the money for the benefit of the Fund V limited partners.  Specifically, I-Enterprise submits evidence that $375,000 of Fund V monies was used to purchase shares of Wit Capital in September 1998, and that in July 1999, approximately $1.6 million in Fund V monies was used to purchase shares of Digital Impact for Fund IV.  (See Kent Decl. Ex. 56 at 10:19-22, 9:20-25.)  I-Enterprise further submits evidence that if the above-referenced Wit Capital shares had been purchased for Fund V, that fund would have earned an additional $3.9 to $4.9 million by the beginning of 2000.  (See Greenfield Decl. Ex. 14 (Fund V Q3 1999 Report) at IEC0504 (showing Wit Capital stock purchased 9/11/98 increased in value from $1.43 to $18.25 per share); see also id. Ex. 17 (Fund V Q1 2000 Report) at IEC0567 (showing Wit Capital stock at $17.125 per share); Ex. 15 (Fund V Q4 1999 Report) at IEC0513 (showing Wit Capital stock at $17.00 per share)).

Defendants state they treated the above-referenced monies as a loan, and repaid the above-referenced "loans" with interest, (see Kent Decl. Ex. 56 at 10:19-22, 9:20-25), and, consequently, nondisclosure of the loans was immaterial.  In particular, defendants point out, the $375,000 used to purchase shares in Wit Capital was repaid to Fund V after approximately one month, on October 14, 1998, and $2,113.65 in interest was paid on November 23, 2004.  (See id. at 10:23-24.)  The $1.6 million used to purchase shares of

1   Digital Impact was repaid in approximately two months, and $16,468 in interest was paid on

2   July 20, 2004.  (See id. at 9:20-25.)  Defendants argue nondisclosure of the loans was

3   immaterial because the loans were repaid promptly.  Additionally, Greenstein attests that

4   "in [his] experience as an accountant and auditor, loans such as the type made by Fund V

5   which are repaid by the end of the reporting year are typically considered immaterial and

6   need not be reported in the annual audited reports."  (See Greenstein Decl. ¶ 163.)

7       At least with respect to the Wit Capital investment, however, I-Enterprise has

8   submitted evidence that Fund V, as of the beginning of 2000, was deprived of

9   approximately $3.9 to $4.9 million in profits on those shares.  Moreover, a reasonable trier

10  of fact could find that an investor would deem it material that fund assets were being used

11  to purchase stock for others at the fund's expense, even if that money was later repaid.

12  Any money used to purchase assets for others is money that is not available for the fund to

13  invest on behalf of its own partners.

14      Accordingly, defendants are not entitled to summary judgment on the ground the

15  nondisclosure of "interfund loans" was immaterial.

16                    **b.    Failure to Disclose Misappropriation of "Compensation and
                              Benefits" Belonging to Fund V**

17

18      As discussed above, I-Enterprise has submitted evidence that when Netzero offered

19  25,000 directed shares to Fonstad, she made those shares available to others, rather than

20  using the value of those shares to reduce the amount of management fees paid by Fund V

21  to the General Partner, as assertedly is required by the section 6.1(d) of the Fund V LPA.

22      Defendants argue that, within the meaning of § 6.1(d), the offer of directed shares

23  cannot be considered "compensation" and thus need not be used to offset management

24  fees.  In that regard, defendants attest that "directed shares are not compensation; directed

25  shares are the opportunity to purchase shares of a company for cash at the IPO price[.]"

26  (See Draper Decl. ¶ 72; Fisher Decl. ¶ 70; Jurvetson Decl. ¶ 69.)  The Court cannot say as

27  a matter of law, however, that such an opportunity has no value and cannot be considered

28  compensation.  Cf. In re Marriage of Cheriton, 92 Cal. App. 4th 269, 286 (2001)

1   (considering stock options part of parent's compensation for purposes of calculating child

2   support).

3          Defendants further argue, however, that, at worst, the decision to retain the Netzero

4   directed shares, and the nondisclosure thereof, were honest mistakes, rather than fraud.

5   The Court agrees.  There is no evidence that defendants were aware of Netzero's offer to

6   Fonstad, let alone that they deliberately decided not to disclose Fonstad's failure to use the

7   Netzero directed shares to reduce Fund V management fees.  In short, there is no

8   evidence from which a reasonable trier of fact could conclude that defendants acted with

9   intent to defraud when, in marketing Fund VI, they failed to disclose the above-referenced

10  transaction.

11         Accordingly, summary judgment for defendants will be granted on I-Enterprise's

12  fraud claim, to the extent such claim is based on a failure to disclose Fonstad's retention of

13  directed shares.

14              **2.  Other Arguments**

15         In addition to the arguments addressed above, defendants set forth two arguments,

16  discussed below, as to their entitlement to summary judgment with respect to certain of the

17  fraud claims.

18              **a.  Capital Calls**

19         The elements of fraud include an "intent to defraud, i.e., to induce reliance."  See

20  Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996).  Defendants argue that I-Enterprise

21  cannot show that defendants intended not to make their required capital contributions.

22  Consequently, defendants argue, they are entitled to summary judgment on I-Enterprise's

23  fraud claim, to the extent such claim is based on defendants' failure to provide promissory

24  notes for their capital contributions.

25         Greenstein attests that, on or about December 31, 1999, DFJ-VI executed a

26  promissory note in the amount of $568,182, representing DFJ-VI's total capital contribution

27  owed to that date.  (See Greenstein Decl. ¶ 151.)  Greenstein acknowledges the note was

28  in the wrong form, as it was not the full recourse promissory note required by the Fund VI

1    Limited Partnership Agreement.  (See id. ¶ 153.)  According to Greenstein, DFJ-VI then

2    failed, due to an oversight, to execute promissory notes for approximately eighteen capital

3    contributions between January 2000 and 2003.  (See id. ¶ 154.)  Although it failed to

4    execute promissory notes, it consistently acknowledged its capital contribution obligations

5    in the fund's financial statements.  (See id. Exs. 114-117.)  According to Greenstein, when

6    DFJ-VI realized it had neglected to execute promissory notes for the majority of its capital

7    contributions, and that its December 31, 1999 note was in the wrong form, it executed, in

8    January 2003, demand full recourse promissory notes for all capital contributions owed as

9    of that date.  (See id. ¶ 155; see also id. Ex. 119 (promissory notes)).  Greenstein attests

10   that, "at all times, [DFJ-VI] has intended to make all capital contributions required of it under

11   the Fund VI Limited Partnership Agreement."  (See Greenstein Decl. ¶ 155.)  Likewise,

12   Draper, Fisher, and Jurvetson all attest that, prior to January 2003, they were unaware that

13   the requisite promissory notes had not been executed, and that the one note that was

14   executed was in the wrong form.  (See Draper Decl. ¶ 84; Fisher Decl. ¶ 82; Jurvetson

15   Decl. ¶ 81.)

16        Additionally, defendants submit evidence that at the same time they were alleged to

17   have been defrauding I-Enterprise by failing to execute promissory notes for their capital

18   contributions to Fund VI, they were investing substantial sums of their own money, and that

19   of their family and friends, in a Fund VI "side-by-side fund," which "invested cash in

20   lockstep with, and on the same terms as, the main funds."  (See Draper Decl. ¶¶ 68-71;

21   Fisher Decl. ¶¶ 66-69; Jurvetson Decl. ¶¶ 65-68; Greenstein Decl. ¶¶ 158-160.)

22        As discussed above, in connection with the negligent misrepresentation claims,

23   however, I-Enterprise has submitted evidence that Greenstein was aware since 1999 that

24   most of the promissory notes had not been executed, and that when I-Enterprise requested

25   copies of the notes, he did not tell I-Enterprise that no executed notes existed, but, rather

26   had a note created to send to I-Enterprise.  Under such circumstances, I-Enterprise has

27   raised a triable issue of material fact as to whether defendants acted with intent to defraud

28   when they represented that the General Partners had executed promissory notes to secure

1   their capital contributions.

2          Accordingly, defendants' motion for summary judgment will be denied as to the fraud

3   claim, to the extent such claim is based on defendants' misrepresentation that the General

4   Partners had executed promissory notes to secure their capital contributions.

5                        **b.  Allocation of Profit and Loss**

6          I-Enterprise alleges that DFJ-VI and the individual defendants represented in the

7   Fund VI Offering Memorandum and Limited Partnership Agreement that they would

8   "determine and allocate profits and losses in a specified manner," and that such

9   representations "were false and misleading in that they failed to disclose that at the time

10  [those] representations were made, [DFJ-VI] was in breach of parallel provisions with

11  respect to Fund V."  (See 4AC ¶ 222.)  Defendants argue that I-Enterprise cannot show

12  any such misrepresentations were made, because defendants allocated profits and losses

13  exactly as set forth in the Fund VI Limited Partnership Agreement.  In response,

14  I-Enterprise submits no evidence that defendants failed to allocate profits and losses in the

15  manner set forth in the Fund VI Offering Memorandum and Limited Partnership Agreement,

16  and, indeed, fails to address the claim at all.

17         Accordingly, I-Enterprise has failed to raise a triable issue of material fact as to

18  whether defendants fraudulently misrepresented the method by which profits and losses

19  would be allocated with respect to Fund VI, and defendants' motion for summary judgment

20  will be granted on I-Enterprise's fraud claim, to the extent such claim is based on such

21  allegations.

22

23         **D.  Claim for Violation of Massachusetts Blue Sky Law**

24         I-Enterprise's claim for violation of the Massachusetts Blue Sky Law,[27] asserted

25  _____

26         [27] Under the Massachusetts Uniform Securities Act, to which I-Enterprise refers as
    the "Massachusetts Blue Sky law," any person who "offers or sells a security by means of
27  any untrue statement of material fact or any omission to state a material fact necessary in
    order to make the statements made, in the light of the circumstances under which they are
28  made, not misleading . . . is liable to the person buying the security from him, who may sue
    either at law or in equity to recover the consideration paid for the security, together with

against DFJ-VI and the individual defendants only, is based on the same alleged

misrepresentations that form the basis of its claim against said defendants for negligent

misrepresentation.  Accordingly, the Court's rulings above, with respect to the negligent

misrepresentation claim, apply equally to I-Enterprise's claim for violation of the

Massachusetts Blue Sky Law, with the exception of the Court's ruling on the issue of

whether such claim is time-barred.[28]

The Court next addresses defendants' additional arguments respecting only the

Massachusetts Blue Sky Law.

### 1.  Choice of Law Provision

Defendants argue I-Enterprise cannot prevail on its claim against DFJ-VI and the

individual defendants for violation of the Massachusetts Blue Sky Law because the parties

agreed in both the Fund VI Subscription Agreement and the Fund VI Limited Partnership

Agreement that California law would govern.  See Greenstein Decl. Ex. 81 (Fund VI

Subscription Agreement) ("This Subscription shall be enforced, governed and construed in

all respects in accordance with the laws of the State of California."); Fund VI LPA § 15.1

("This Agreement shall be governed by and construed under the laws of the State of

California as applied to agreements among the residents of such state made and to be

performed entirely within such state.").  Defendants previously moved to dismiss this claim

on the same ground, and the Court denied the motion, noting that the Fund VI Subscription

Agreement expressly provided: "Notwithstanding any of the representations, warranties,

acknowledgments or agreements made hereby by the undersigned, the undersigned does

not hereby or in any other manner waive any rights granted to him or her under federal or

state securities laws."  (See July 2005 Order at 12.)  The Court noted that "[r]ead together,

the two sections are susceptible of an interpretation under which California law generally

---

interest at six per cent per year from the date of payment, costs, and reasonable attorneys'
fees, less the amount of any income received on the security, upon the tender of the
security."  See Mass. Gen. Laws, ch. 110A, § 410(a)(2).

[28] The statutes of limitations for negligent misrepresentation and violation of the
Massachusetts Blue Sky law are different, as set forth below.

1   governs, but investors in Fund VI are not precluded from bringing suit to enforce their rights

2   under any applicable federal or state securities law."  (See id.)[29]

3        Defendants now argue that the California choice of law provision in the Subscription

4   Agreement and Limited Partnership Agreement trumps the more general anti-waiver

5   provision in the Subscription Agreement.  None of the cases cited by defendants involves

6   the instant situation, however, where a choice of law clause and a clause expressly

7   declining to waive rights granted under the federal and state securities laws appear in the

8   same agreement.  Accordingly, the Court declines to revisit its earlier ruling, and finds

9   defendants are not entitled to summary judgment on the Massachusetts Blue Sky Law

10  claim on the ground such claim is barred by the choice of law provision in the Subscription

11  Agreement and Limited Partnership Agreement.

12                    **2.  Public Policy**

13       Defendants further argue they are entitled to summary judgment on I-Enterprise's

14  claim for violation of the Massachusetts Blue Sky Law because application of

15  Massachusetts law would violate California public policy.  Specifically, defendants argue

16  that I-Enterprise's claim would be time-barred if brought under California law.  Defendants

17  raised this argument previously in a motion to dismiss.  In ruling on that motion, the Court,

18  while recognizing that "California's interest in applying its own law is strongest when its

19  statute of limitations is shorter than that of the foreign state, because a state has a

20  substantial interest in preventing the prosecution in its courts of claims which it deems to be

21  stale," nonetheless denied the motion to dismiss because defendants had made no

22  showing that I-Enterprise's claim for violation of the Massachusetts Blue Sky Law would be

23  time-barred if brought under California law.  (See July 15 Order at 13 (quoting Deutsch v.

24  Turner Corp., 324 F.3d 692, 717 (9th Cir. 2003)).  Defendants now argue the evidence

25  demonstrates that I-Enterprise's claim would be time-barred if brought under California law.

26       As the Court noted in ruling on the motion to dismiss, the California Securities Act

27  _____

28       [29] The Court further noted that both the California and Massachusetts Blue Sky Laws
     contain an anti-waiver provision.  (See id. n.5.)

41

has a shorter statute of limitations than the four-year period set forth under the

Massachusetts Blue Sky law.  <u>Compare</u> Cal. Corp. Code § 25506 (providing that "no action

shall be maintained . . . unless brought before the expiration of four years after the act or

transaction constituting the violation or the expiration of one year after the discovery by the

plaintiff of the facts constituting the violation, whichever shall first expire") <u>with</u> Mass. Gen.

Laws, ch. 110A, § 410(e) (providing that "[n]o person may sue . . . more than four years

after the discovery by the person bringing the action of a violation").  The complaint in the

instant action was filed April 11, 2003,[30] and I-Enterprise's claims were filed July 23, 2003,

both of which dates are within four years of the dates Roy entered into the Fund VI

Subscription Agreement and Limited Partnership Agreement.  (<u>See</u> Fund VI Subscription

Agreement, entered into July 31, 1999, and Fund VI LPA, entered into August 13, 1999.)

The remaining issue is whether the complaint was filed within "one year after the discovery

by the plaintiff of the facts constituting the violation."  <u>See</u> Cal. Corp. Code § 25506.  The

California Court of Appeal has held identical language in another provision of the California

Securities Act to require "actual knowledge, not just 'inquiry notice.'"  <u>See</u> <u>Eisenbaum</u>, 218

Cal. App. 3d at 325 (interpreting Cal. Corp. Code § 25507).  Accordingly, I-Enterprise's

claim is not time-barred under California law unless it had actual knowledge of the asserted

violations of the Massachusetts Blue Sky Law more than one year before the complaint

was filed.

As noted, the allegations in support of I-Enterprise's claim for violation of the

Massachusetts Blue Sky Law are identical to those alleged in support of its claims for

negligent misrepresentation.  Although the statute of limitations for the negligent

misrepresentation claims is longer than the one-year discovery provision of § 25506,

defendants' arguments as to why the negligent misrepresentation and Massachusetts Blue

Sky Law claims are time-barred are, essentially, identical.  Because, as discussed earlier,

I-Enterprise was on notice as to the alleged misrepresentations concerning investment

---

[30] As noted, the initial complaint was for declaratory relief and filed by defendants.

objectives more than three years before the instant action was filed, I-Enterprise

necessarily was on notice as to those misrepresentations more than one year before the

action was filed.  Consequently, the Court's rulings as set forth above with respect to the

timeliness of the negligent misrepresentation claims are equally applicable to the claim for

violation of the Massachusetts Blue Sky Law.

Accordingly, defendants have demonstrated that the Massachusetts Blue Sky Law

claim, to the extent it is based on misrepresentations of investment objectives, would be

time-barred if brought under California law, and, consequently, defendants are entitled to

summary judgment on said claim, to the extent it is based on misrepresentations of

investment objectives, because application of Massachusetts law would violate California

public policy.  See Deutsch, 324 F.3d at 717.  As defendants have not demonstrated that

the remainder of the Massachusetts Blue Sky claim is time-barred, however, defendants

are not entitled to summary judgment on that claim in its entirety.

**E.  Claim for Violation of California Blue Sky Law**

I-Enterprise's claim for violation of the California Blue Sky Law,[31] asserted against

DFJ-VI and the individual defendants only, is based on the same alleged

misrepresentations that form the basis of its claim against said defendants for negligent

misrepresentation.  Accordingly, the Court's rulings above, with respect to the negligent

misrepresentation claim, apply equally to I-Enterprise's claim for violation of the California

Blue Sky Law.

---

[31] I-Enterprise's claim for violation of the California Blue Sky Law is based on §§ 25401 and 25501 of the California Corporations Code. Section 25401 provides: "It is unlawful for any person to offer to sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  See Cal. Corp. Code § 25401.  Section 25501 provides, in relevant part, "Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if he had exercised reasonable care would not have known) of the untruth or omission."  See Cal. Corp. Code § 25501.

1      The Court next addresses defendants' additional arguments respecting the

2  California Blue Sky Law.

3      **1. Timeliness**

4      Defendants move for summary judgment on I-Enterprise's claim for violation of the

5  California Blue Sky Law on the ground that such claim is time-barred.  Because the Court's

6  ruling as to the timeliness of the negligent misrepresentation claims is equally applicable to

7  I-Enterprise's claim for violation of the California Blue Sky Law, defendants have

8  demonstrated that the California Blue Sky Law claim, to the extent such claim is based on

9  misrepresentations as to investment objectives, is time-barred.  Accordingly, defendants

10  are entitled to summary judgment thereon.  Because defendants have not demonstrated

11  that the remainder of the California Blue Sky claim is time-barred, however, defendants are

12  not entitled to summary judgment on such claim in its entirety.

13      **2. Intent**

14      Defendants also argue they are entitled to summary judgment on the California Blue

15  Sky Law claim on the ground I-Enterprise cannot show defendants acted with the requisite

16  intent.

17      I-Enterprise alleges that defendants violated California Corporations Code §§ 25401

18  and 25501 by selling an interest in Fund VI "by means of one or more untrue statements of

19  material fact or one or more omissions to state material facts necessary to make the

20  statements made, in light of the circumstances under which they are made, not

21  misleading[.]" (See 4 AC ¶ 292.)  As I-Enterprise correctly notes, §§ 25401 and 25501

22  make no reference to intent, and the cases upon which defendants rely address claims

23  brought under different statutes, §§ 25400 and 25500, which expressly require,

24  respectively, an unlawful "purpose" and a showing of "willfullness."  See Cal. Corp. Code

25  §§ 25400, 25500.  By contrast, a civil claim for violation of §§ 25401 and 25501 does not

26  require a showing of intent.  See California Amplifier, Inc. v. RLI Ins. Co., 94 Cal. App. 4th

27  102, 109 (2002) (noting "section 25500 is limited to intentional misrepresentations" while

28  § 25501 "extend[s] liability to some negligent conduct"); see also People v. Simon, 9 Cal.

4th 493, 516 (1995) (noting civil claim for violation of §§ 25401 and 25501 requires proof that "the seller was aware or was negligent in failing to be aware that his representations were misleading") (emphasis added).

Accordingly, as I-Enterprise's claim for violation of §§ 25401 and 25501 does not require proof of intent, defendants are not entitled to summary judgment on that claim on the ground I-Enterprise cannot prove defendants made intentional misrepresentations.

### F.  Contract Claims Against Individual Defendants

The individual defendants argue that all contract claims asserted against them must be dismissed because they are not parties to the Fund V or Fund VI LPAs.  Each of the individual defendants attests that he was not a party to the Fund V or Fund VI LPA in his individual capacity, and that his only involvement with the LPAs was in his capacity as a Managing Member of DFJ-V and DFJ-VI.  (See Draper Decl. ¶¶ 20, 35; Fisher Decl. ¶¶ 18, 33; Jurvetson Decl. ¶¶ 18, 33.)  I-Enterprise, in its opposition, makes no argument and cites no evidence suggesting that the individual defendants are parties to the LPAs, or that they otherwise can be held liable for breaching any provision of those agreements.

Accordingly, summary judgment for defendants will be granted on all claims for breach of contract and breach of the covenant of good faith and fair dealing asserted against the individual defendants.

### G.  Contract Claims Against DFJ-V and DFJ-VI

Although the Court previously dismissed many of I-Enterprise's claims for breach of contract and breach of the covenant of good faith and fair dealing as improperly asserted derivative claims, the Court also found that, to the extent the contract claims were based on an asserted failure to distribute marketable securities and failure to disclose "Detrimental Acts," such claims were not derivative claims and thus not subject to dismissal.  (See Order Granting in Part and Denying in Part Counterdefendants' Motion for Judgment on the Pleadings, filed December 15, 2004, ("December 2004 Order") at 15-16; see also July 2005 Order at 7-8.)  Defendants now move for summary judgment on all remaining contract claims, as asserted against DFJ-V and DFJ-VI.

45

1

### 1.  Failure to Distribute Marketable Securities

The LPAs provide that the General Partners may, at their discretion, distribute marketable securities to the limited partners, under certain circumstances.  (See Greenberg Decl. Ex. 4 (Fund V LPA) § 7.5; see also id. Ex. 87 (Fund VI LPA) § 7.5.)  I-Enterprise alleges that DFJ-V breached the LPA by failing to distribute shares of Wit Capital, Netzero, and Ciena in a timely manner.  (See 4AC ¶ 128.)  I-Enterprise alleges that DFJ-VI breached the LPA by failing to distribute shares of United Online, Extended Systems, and Keynote Systems in a timely manner.  (See id. ¶ 130.)  Defendants move for summary judgment on I-Enterprise's contract claims to the extent such claims are based on an alleged failure to distribute marketable securities, on the ground I-Enterprise has no evidence showing defendants abused their discretion in determining when to distribute marketable securities. As defendants point out, defendants have submitted declarations attesting to the reasons they did or did not distribute the above-referenced securities, (see Draper Decl. ¶¶ 76-82; Fisher Decl. ¶¶ 74-80; Jurvetson Decl. ¶¶ 73-79), and I-Enterprise, in response, has made no argument nor cited to any evidence suggesting that defendants abused their discretion under the LPAs in determining when or whether to distribute any of the above-referenced securities.

Accordingly, summary judgment for defendants will be granted on the claims for breach of contract and breach of the covenant of good faith and fair dealing asserted against DFJ-V and DFJ-VI, to the extent such claims are based on an alleged failure to distribute marketable securities in a timely manner.

### 2.  Failure to Disclose Detrimental Acts

The LPAs for Fund V and Fund VI require that the General Partner give written notice to the limited partners if the General Partner or any of its managing members has committed a "Detrimental Act."[32]  (See Greenberg Decl. Ex. 4 (Fund V LPA) § 14.9; see

---

[32]  The LPAs define "Detrimental Act" as "(i) actual fraud or willful misconduct which directly causes a material adverse effect to the Partnership or its assets or (ii) being convicted of a felony or of securities fraud or embezzlement."  (See Greenberg Decl. Ex. 4 (Fund V LPA) § 8.4; see also id. Ex. 87 (Fund VI LPA) § 8.4.)

also id. Ex. 87 (Fund VI LPA) § 14.9.)  Each LPA further provides that the Fund may be

terminated if, within 90 days of receipt of such notice, two-thirds of the limited partners vote

to terminate the Fund.  (See id.)  Defendants, relying on several grounds, move for

summary judgment on all of I-Enterprise's contract claims to the extent such claims are

based on a failure to disclose Detrimental Acts.

Defendants' first argument is that I-Enterprise cannot prevail on these claims

because it has not pursued what defendants contend are the only "direct remedies"

available to it, specifically, a vote of the limited partners to terminate the Funds, or judicial

dissolution of the Funds.[33]  I-Enterprise responds that it suffered injury and damages as a

result of defendants' alleged failure to provide notice of Detrimental Acts because, had it

received such notice, it would not have invested in Fund VI, would have sought dissolution

of the partnerships or to replace the General Partner, and would not have been required to

make capital calls.  I-Enterprise argues that by the time it learned of the extent of

defendants' failure to disclose Detrimental Acts, I-Enterprise had already made most of its

capital contributions and this litigation existed, by which I-Enterprise's rights could be

vindicated.  Consequently, I-Enterprise argues, there was no reason to file a duplicative

state court action for dissolution of the Funds.

The Court agrees with I-Enterprise that if I-Enterprise were able to demonstrate

defendants failed to disclose Detrimental Acts, and that, had I-Enterprise known of such

acts at the time they were committed, it would not have invested in Fund VI or would have

sought dissolution of the Funds, I-Enterprise conceivably would be able to show it suffered

damages as a result of defendants' failure to give such notice.  I-Enterprise, however, has

submitted no evidence that it would have taken such action had it known of defendants'

---

[33] Defendants previously moved to dismiss I-Enterprise's contract claims for failure
to disclose Detrimental Acts, on the ground that I-Enterprise could not show that it suffered
any injury; the Court denied that motion because the gravamen of I-Enterprise's claims was
that defendants' failure to provide notice of Detrimental Acts precluded I-Enterprise from
taking action to protect its investment in the funds, and that defendants had not shown, as
a matter of law, there was no action I-Enterprise could have taken to protect its investment
had it received notice of defendants' alleged wrongdoing.  (See July 2005 Order at 8-9.)

1   failure to disclose Detrimental Acts at the time such acts were committed.  Although

2   I-Enterprise, in its opposition, asserts that it would have avoided investing in Fund VI had it

3   learned of acts of misconduct that occurred prior to August 1999, and that, as to acts of

4   misconduct occurring thereafter, it would have attempted to seek dissolution of the Funds

5   or removal of the General Partners, no such statement appears in the declaration cited in

6   support thereof.  (See Opp. at 28:9-14 (citing Roy Decl. ¶¶ 6, 8, 11).)[34]

7       Accordingly, I-Enterprise has not established a triable issue of material fact exists as

8   to whether it was damaged by defendants' alleged failure to disclose Detrimental Acts, and

9   summary judgment for defendants will be granted on I-Enterprise's claims for breach of

10  contract and breach of the covenant of good faith and fair dealing, to the extent such claims

11  are based on such alleged nondisclosure.[35]

12          **3.      Investment in DFJ Affiliate in Violation of Fund VI LPA**

13      I-Enterprise contends defendants violated the Fund VI LPA by investing in Amazing

14  Media, which I-Enterprise contends was a Fund VI affiliate, without obtaining prior consent

15  to the transaction from the limited partners.  I-Enterprise fails, however, to cite to any

16  provision of the Fund VI LPA requiring prior consent of the limited partners to any such

17  transaction.  Moreover, I-Enterprise fails to cite to any evidence suggesting that Amazing

18  Media was an "affiliate" of Fund VI within the meaning of the Fund VI LPA.  (See

19  Greenstein Decl. Ex. 87 (Fund VI LPA) ¶ 14.3 ("An Affiliate of any person shall mean any

20  person that directly, or indirectly through one or more intermediaries, controls, or is

21  controlled by or is under common control with the person specified.").

22      Accordingly, summary judgment for defendants will be granted on I-Enterprise's

23

24      [34] Although Roy attests that if defendants had disclosed that they were
    contemplating devoting less time and energy to Fund VI, he would not have invested (see
25  Roy Decl. ¶ 6), the Court previously has dismissed all claims based either on defendants'
    alleged failure to devote an objectively adequate amount of time to management of the
26  Funds or on alleged misrepresentations about the amount of time defendants would devote
    to the management of the Funds.  (See November 2005 Order at 9-10.)
27

28      [35] As a result of this ruling, the Court does not reach the parties' arguments as to
    whether defendants in fact committed any Detrimental Acts and failed to disclose them.

claims for breach of contract and breach of the covenant of good faith and fair dealing, to the extent such claims are based on Fund VI's investment in Amazing Media.

### H.  Breach of Fiduciary Duty Claims

Defendants do not offer a separate argument as to why summary judgment should be granted for defendants on I-Enterprise's claims for breach of fiduciary duty; rather, defendants argue they are entitled to summary judgment on those claims for the same reasons they are entitled to summary judgment on I-Enterprise's claims for breach of contract and breach of the covenant of good faith and fair dealing.  In response, I-Enterprise argues that defendants are liable for breaching their fiduciary duties to I-Enterprise, regardless of whether they are liable for breach of contract or breach of the covenant of good faith and fair dealing.

The Court previously has dismissed I-Enterprise's claims for breach of fiduciary duty, on the ground they are improperly asserted derivative claims, except to the extent they are based on an alleged failure to distribute marketable securities and failure to disclose Detrimental Acts.  (See December 2004 order at 3-4, 19-20; see also July 2005 order at 2-3, 5-9.)  With respect to the former, any duty to distribute marketable securities to I-Enterprise derives entirely from the LPAs, (See Fund V LPA § 7.5; Fund VI LPA § 7.5), and as discussed above, I-Enterprise has submitted no evidence that defendants abused their discretion under the LPAs in determining whether or when to distribute any securities. Accordingly, for the same reasons summary judgment will be granted for defendants on I-Enterprise's contract claims, summary judgment also will be granted for defendants on I-Enterprise's claim for breach of fiduciary duty, to the extent such claim is based on a failure to distribute marketable securities.

With respect to the alleged failure to disclose Detrimental Acts, although defendants have a contractual duty, based on the language of the Limited Partnership Agreements, to disclose Detrimental Acts, they also have an independent fiduciary duty of disclosure to the limited partners.  See, e.g., McCain v. Phoenix Resources, Inc., 185 Cal. App. 3d at 579 ("Partners have a duty to make a full and fair disclosure of all matters substantially affecting

1   the value of the partnership.").  As discussed in the Court's prior orders, however, any claim

2   for breach of the fiduciary duty of disclosure is a derivative claim that cannot be asserted in

3   the instant lawsuit, unless the asserted breach caused I-Enterprise to suffer an injury that is

4   not incidental to the injury suffered by the entire partnership.  (See December 2004 Order

5   at 5-6, 9-12; July 2005 Order at 5-9.)  At that time, the Court held I-Enterprise's claims for

6   breach of the fiduciary duty of disclosure were not subject to dismissal as derivative claims

7   because I-Enterprise had alleged that defendants' failure to provide notice of their

8   wrongdoing prevented I-Enterprise, individually, from taking action to protect its investment.

9   (See July 15 Order at 5-9.)[36]  At this stage of the proceedings, however, I-Enterprise was

10  required to submit, but has not submitted, evidence in support of the allegation.

11      Accordingly, summary judgment for defendants will be granted on I-Enterprise's

12  claims for breach of fiduciary duty.

13      **I. Accounting**

14      Defendants move for summary judgment on I-Enterprise's claim for an accounting,

15  on the ground I-Enterprise has failed to establish the requisite fraud necessary to support

16  an accounting claim.  I-Enterprise alleges a claim for an accounting on the basis of DFJ-V's

17  alleged breach of its fiduciary duty to I-Enterprise, and because the partnership accounts

18  are complicated.  (See 4AC ¶¶ 215-219, 283-287.)  Breach of fiduciary duty, complicated

19  accounts, and fraud are all "proper grounds for an accounting."  See Union Bank v.

20  Superior Court, 31 Cal. App. 4th 573, 593 (1995).  The existence of complicated accounts

21  does not entitle a plaintiff to an accounting, however, where the defendants have engaged

22  in no misconduct, no money is owed, and no property must be returned.  See id.

23      As discussed above, defendants are entitled to summary judgment on I-Enterprise's

24  claim for breach of fiduciary duty, but have not established they are entitled to summary

25  judgment with respect to the entirety of I-Enterprise's fraud claim.  Consequently, they have

26

27          [36] In particular, the Court noted that, under the LPAs, I-Enterprise could have sought
    termination of the partnership through a vote of the limited partners, or could have sought
28  judicial dissolution.  (See id. at 8-9.)

1   not demonstrated their entitlement to summary judgment on the accounting claim.

2       **J.  Unjust Enrichment**

3       Defendants move for summary judgment on I-Enterprise's claims for unjust

4   enrichment, on the same ground they moved to dismiss said claim.  Specifically,

5   defendants contend the unjust enrichment claim is an improperly pleaded derivative claim.

6   The Court, however, denied defendants' motion to dismiss the unjust enrichment claim,

7   (see November 2005 Order at 3-4), and defendants set forth no additional ground to

8   support judgment in their favor at this time.  Accordingly, defendants' motion for summary

9   judgment on I-Enterprise's claim for unjust enrichment will be denied.

10      **K.  Punitive Damages**

11      Defendants argue they are entitled to summary judgment on I-Enterprise's claims for

12  punitive damages.  I-Enterprise seeks punitive damages only with respect to its claims for

13  fraud and breach of fiduciary duty.  (See 4AC ¶¶ 202, 228, 275.)  Under California law, a

14  plaintiff is entitled to punitive damages "where it is proven by clear and convincing evidence

15  that the defendant has been guilty of oppression, fraud, or malice."  See Cal. Civ. Code

16  § 3294.  Although the Court has found defendants are entitled to summary judgment on

17  I-Enterprise's claims for breach of fiduciary duty, it has not granted the motion for summary

18  judgment with respect to the entirety of the fraud claim.  Accordingly, defendants are not

19  entitled to summary judgment on the issue of punitive damages.

20                              **CONCLUSION**

21      For the reasons set forth above, defendants' motions for summary judgment are

22  hereby GRANTED IN PART and DENIED IN PART, as follows:

23      1.  Defendants' motions for summary judgment are GRANTED on I-Enterprise's

24  claims for negligent misrepresentation, violation of the Massachusetts Blue Sky Law, and

25  violation of the California Blue Sky Law, except to the extent such claims are based on the

26  following allegations, as to which claims the motions are DENIED:  (1) the Fund V and

27  Fund VI Offering Memoranda misrepresented that Draper was a "start-up investor" in

28  Parametric and that Draper "made more than 500 times his money on the original

1   investment"; (2) the Fund VI Offering Memorandum misrepresented that Fund III's

2   $300,000 initial investment in Hotmail was worth 350 times that amount by June 30, 1999;

3   (3) the Fund V and Fund VI Offering Memoranda misrepresented that DFJ was a "seed

4   investor" in Preview Travel and an investor of the "1st Professional Round" of Preview

5   Travel; and (4) the Fund V and Fund VI Financial Statements misrepresented that the

6   General Partners had executed promissory notes to secure their capital contributions.

7        2.  Defendants' motions for summary judgment are GRANTED on I-Enterprise's

8   fraud claim, except to the extent such claims are based on the following allegations, as to

9   which claims the motions are DENIED:  (1) the Fund V and Fund VI Offering Memoranda

10  misrepresented that Draper was a "start-up investor" in Parametric and that Draper "made

11  more than 500 times his money on the original investment"; (2) the Fund VI Offering

12  Memorandum misrepresented that Fund III's $300,000 initial investment in Hotmail was

13  worth 350 times that amount by June 30, 1999; (3) the Fund V and Fund VI Offering

14  Memoranda misrepresented that DFJ was a "seed investor" in Preview Travel and an

15  investor of the "1st Professional Round" of Preview Travel; (4) the Fund V and Fund VI

16  Financial Statements misrepresented that the General Partners had executed promissory

17  notes to secure their capital contributions; and (5) defendants failed to disclose that Fund V

18  monies had been diverted to purchase securities for others, rather than for the benefit of

19  Fund V's limited partners.

20       3.  Defendants' motions for summary judgment on I-Enterprise's claims for breach of

21  contract, breach of the covenant of good faith and fair dealing, and breach of fiduciary duty

22  are GRANTED.

23       4.  Defendants' motions for summary judgment on I-Enterprise's claims for an

24  accounting, for unjust enrichment, and for punitive damages, are DENIED.

25       This order terminates Docket Nos. 471, 472 and 473.

26       **IT IS SO ORDERED.**

27

Dated: December 30, 2005                        _____
28                                              MAXINE M. CHESNEY
                                                United States District Judge

52